No. 117,725

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

HOWARD JOHNSON III,
*Appellant*,

v.

U.S. FOOD SERVICE,

and

AMERICAN ZURICH INSURANCE CO.,
*Appellees*.

SYLLABUS BY THE COURT

1.

Section 18 of the Kansas Constitution Bill of Rights guarantees an individual's right to a remedy: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law."

2.

Under the Fourteenth Amendment of the United States Constitution, no State shall "deprive any person of life, liberty, or property without due process of law."

3.

The Legislature may substitute a statutory remedy for one available at common law. But due process requires that the substitute provides an adequate remedy for the common-law remedy that has been abolished.

4.

Once the Legislature has established a substitute remedy, it cannot constitutionally proceed to emasculate the remedy by amendments to the point that it is no longer a viable substitute remedy.

5.

The Kansas Workers Compensation Act provides an administrative procedure for providing compensation to injured workers in exchange for the relinquishment of the injured worker's common-law right to sue a negligent employer in tort for damages.

6.

When our Legislature enacts changes in our Workers Compensation Act, for the changes to satisfy the constitutional requirement of due process (1) the changes must be reasonably necessary in the public interest to promote the general welfare of the people of Kansas, and (2) the Act in its currently modified form must continue to provide an adequate substitute remedy for an injured worker's right to bring a common-law action for the recovery of damages.

7.

After the adoption in K.S.A. 2015 Supp. 44-510d(b)(23) and (b)(24) and K.S.A. 2015 Supp. 44-510e(a)(2)(B) of the Sixth Edition of the American Medical Association Guides to the Evaluation of Permanent Impairment (6th ed. 2008) as the Guide to be used for measuring the permanent impairment of injured workers, our Kansas Workers Compensation Act no longer provides an adequate substitute remedy for injured workers who suffer a permanent impairment on or after January 1, 2015, and K.S.A. 2015 Supp. 44-510d(b)(23) and (b)(24) and K.S.A. 2015 Supp. 44-510e(a)(2)(B) violate the constitutional requirement for due process.

8.

Because K.S.A. 44-574(b) provides for the severability of a provision in the Kansas Workers Compensation Act which is found to be unconstitutional, the appropriate remedy in this case is to strike from K.S.A. 2015 Supp. 44-510d(b)(23) and (b)(24) and K.S.A. 2015 Supp. 44-510e(a)(2)(B), the provisions requiring the use of the Sixth Edition of the AMA Guides, thereby leaving the Fourth Edition of the AMA Guides as the applicable Guide in the evaluation of an injured worker's permanent impairment.

Appeal from Workers Compensation Board. Opinion filed August 3, 2018. Reversed and remanded with directions.

*Mark E. Kolich*, of Lenexa, for appellant.

*Michelle Daum Haskins*, of Constangy, Brooks, Smith & Prophete, LLP, of Kansas City, Missouri, for appellees.

*Jeffrey A. Chanay*, chief deputy attorney general, *Toby Crouse*, solicitor general, and *Dwight R. Carswell* and *Bryan C. Clark*, assistant solicitors general, for amicus curiae State of Kansas.

Before MCANANY, P.J., LEBEN and SCHROEDER, JJ.

MCANANY, J.: Our opinion in this workers compensation appeal follows on the heels of the recent opinion in *Pardo v. United Parcel Services*, 56 Kan. App. 2d 1, ___ P.3d ___ (No. 116,842 filed June 1, 2018). In *Pardo*, a panel of our court determined that the use of the Sixth Edition of the American Medical Association (AMA) Guides to the Evaluation of Permanent Impairment (6th ed. 2008) as mandated by K.S.A. 2015 Supp. 44-510d(b)(23) was unconstitutional as applied to Pardo, an injured worker. 56 Kan. App. 2d at 25. Today, we are asked to declare that the use of the Sixth Edition of the AMA Guides is unconstitutional on its face.

3

On October 16, 2015, Howard Johnson, who had been employed by U.S. Food Service since 2002 as a delivery driver, suffered an on-the-job injury to his neck when he tried to dislodge a partially frozen trailer door at work.

Later that month, Dr. Harold Hess, a neurosurgeon, examined Johnson for the first time. Johnson complained of neck and left arm pain along with numbness and weakness in his left arm. Dr. Hess ordered an MRI scan of Johnson's neck which disclosed a spinal cord compression due to disc herniations at levels C5-C6 and C6-C7. Physical findings confirmed this injury. Dr. Hess diagnosed Johnson with cervical myeloradiculopathy.

On November 17, 2015, Johnson filed a claim for workers compensation benefits.

In January 2016, Dr. Hess operated on Johnson's neck. He removed the disc material at C5-C6 and C6-C7 and replaced it with bone from a cadaver in order to "create a fusion across the two vertebral bodies, across the disc space." He also screwed a metal plate into the vertebrae as a temporary stabilizer.

On April 15, 2016, Johnson was released to return to work, but he continued to experience symptoms from the injury to his neck and has modified the way he performs his duties to accommodate his injury.

Dr. Hess used the Sixth Edition of the AMA Guides in rating Johnson's permanent impairment at 6% of the whole person. Dr. Hess noted that if he had used the Fourth Edition of the American Medical Association Guides to the Evaluation of Permanent Impairment (4th ed. 1995), which had been in effect until January 1, 2015, Johnson's rating would have been 25%. Dr. Hess testified that he believed that the 25% impairment

rating was representative of Johnson's true impairment considering his loss of range of motion and his potential need for future surgery. He explained that 20% to 30% of fusion patients experience accelerated degeneration of adjacent discs in the neck within 10 years and require additional surgery.

Dr. Hess has been performing cervical fusions since 1988. He testified that other than the use of cervical plates that began in the 1990s, there has been no change in the surgical technique for cervical fusions, and the expected surgical outcome remains the same. According to Dr. Hess, there have been no advancements in medical treatment or science that would warrant the lower impairment ratings provided in the Sixth Edition of the AMA Guides.

Dr. Preston Brent Koprivica, a physician with an expertise in occupational medicine, testified that he has been performing independent medical evaluations for more than 30 years using the Third, Third Revised, Fourth, and Sixth Editions of the AMA Guides. He stated that all versions of the AMA Guides before the Sixth Edition specify a minimum of 25% impairment rating for an injury similar to Johnson's. He agreed with Dr. Hess that Johnson's impairment rating would have been a minimum of 25% under the Fourth Edition. Dr. Koprivica testified:

> "[I]n his case he's had damage to his spinal cord. That's what the myelopathy part that Dr. Hess was talking about in his treatment record and deposition testimony is referring to. So structurally there's been damage to his spinal cord. Now, he's recovered neurologically, which is what you hope for, but there's still some permanent damage there. That's of significance.
>
> "The second thing that I think is of great significance is the spine has been permanently structurally changed. In order to do your treatment you've changed the original anatomic makeup of the spine. Two motion segments no longer move. That's what a fusion is. You prevent movement at those motion segment levels.

5

"The problem with that is that what's observed in that patient population is that adjacent segments to the fused segments break down. They have an accelerated degeneration that occurs and those structural changes are of significance. They get changes in their facet joints, get greater arthritis, they get ligament changes in terms of hypertrophy of those ligaments trying to absorb forces.

"That's what your body does whenever you're put under unusual stresses. You try to adapt and your body will adapt for that by increasing the size of the ligament. But that has an implication. It takes up space in the spinal canal area. It causes narrowing. The discs at those motion segments adjacent degenerate and part of that degeneration process is there's a much greater propensity to herniate."

Dr. Koprivica opined that there is a 25% to 30% probability that Johnson will need further surgery within 10 years. He concluded that 25% is representative of Johnson's true impairment rating given the severity of his injury. According to Dr. Koprivica, there is no scientific support for the reduced ratings in the Sixth Edition of the AMA Guides, as there has been no progression of medical knowledge, technology, or skill which would account for or justify the lower ratings. Dr. Koprivica stated that the ratings represent a consensus of opinion of a small committee of physicians.

If Johnson's impairment had been calculated under the Fourth Edition of the AMA Guides, his award for a 25% impairment would have been $61,713.70. But under the Sixth Edition of the AMA Guides, Johnson's impairment rating was only 6%, for an award of $14,810.80. Had Johnson been injured before January 1, 2015, rather than nine months later, the award for his impairment would have been nearly $47,000 greater.

Attorney Jeff Cooper, a workers compensation practitioner, testified about major proposed changes to the Workers Compensation Act (Act) before 2011:

"Well, for the last I would say eight years before 2011, there had been a series of bills proposed in the legislature, all of which were designed to reduce benefits to injured workers. It was Senate Bill 418 and Senate Bill 181, I believe were the numbers in corresponding years. We had been able on behalf of injured workers, and I testified on behalf of KTLA, we'd been able to avoid some of those draconian measures against injured workers because we had some moderate Republicans in the Senate that generally were not real eager to disadvantage injured workers in the state of Kansas, so we'd been able to basically avoid those changes being made.

"As you may recall, in 2010 there was an election in Kansas and the Kansas Chamber of Commerce made an organized effort to get all those moderates replaced on the Senate and with the exception of maybe one moderate senator out of Topeka, they were successful in all those endeavors.

"So the landscape had changed from the standpoint of what we perceived to be a worker friendly or at least a worker neutral Senate to one that was no longer friendly to workers, and also we had large Republican majorities in the House that were similarly situated and had campaigned on changing workers' compensation benefits.

"So the meeting was held because there were proposed major changes to the Workers' Compensation Act in Kansas. There were rumors of going to a Texas system and those kind of things, and the informal meeting was had basically to try to work out something that would be at least fair to injured workers."

According to Cooper, an agreement was reached during the 2011 negotiations among a number of groups with an interest in workers compensation—a group that drafted the proposed 2011 changes—that any changes to the Act would not include a change in the method for determining the extent of impairment, and both sides agreed that the Fourth Edition of the AMA Guides would continue to be used. Of course, the final decisions remained the prerogative of the Legislature and the Governor, not these groups. And two years later, the Legislature amended K.S.A. 44-510e and adopted the Sixth Edition of the AMA Guides for all injuries sustained after January 1, 2015.

7

Following the final hearing on Johnson's claim, the administrative law judge (ALJ) awarded $14,804.70 for Johnson's 6% impairment rating under the Sixth Edition of the AMA Guides. The Board affirmed. Neither the ALJ nor the Board addressed Johnson's constitutional issue because they lacked the jurisdiction to do so.

Johnson's appeal brings the matter to us. The sole issue on appeal is the constitutionality of the requirement in the 2013 amendment to K.S.A. 44-510e that permanent impairment ratings for workers injured on or after January 1, 2015, be calculated using the Sixth Edition of the AMA Guides.

JOHNSON'S CLAIM ON APPEAL AND OUR STANDARDS FOR APPELLATE REVIEW

Johnson contends that the change in K.S.A. 2015 Supp. 44-510e which requires the use of the Sixth Edition of the AMA Guides violates § 18 of the Kansas Constitution Bill of Rights and the Fourteenth Amendment of the United States Constitution. He claims that the reduction in workers compensation awards diminishes or abrogates a remedy protected by due process without promoting the general welfare and without providing an adequate substitute remedy.

Determining a statute's constitutionality is a question of law over which we have unlimited review. We presume statutes are constitutional and resolve all doubts in favor of a statute's validity. We interpret a statute in a way that makes it constitutional if there is any reasonable construction that would maintain the Legislature's apparent intent. Before striking down a statute as unconstitutional, the violation must be clear. *Solomon v. State*, 303 Kan. 512, 523, 364 P.3d 536 (2015).

8

## THE HISTORY OF THE WORKERS COMPENSATION SCHEME
## IN KANSAS AND ITS CONSTITUTIONAL FOUNDATIONS

The statutory provision at issue in this case is found in K.S.A. 2015 Supp. 44-510e, which provides:

"(a) In case of whole body injury resulting in temporary or permanent partial general disability not covered by the schedule in K.S.A. 44-510d, and amendments thereto, the employee shall receive weekly compensation as determined in this subsection during the period of temporary or permanent partial general disability not exceeding a maximum of 415 weeks.

. . . .

(2)(B) The extent of permanent partial general disability shall be the percentage of functional impairment the employee sustained on account of the injury as established by competent medical evidence and based on the fourth edition of the American medical association guides to the evaluation of permanent impairment, if the impairment is contained therein, until January 1, 2015, but for injuries occurring on and after January 1, 2015, based on the sixth edition of the American medical association guides to the evaluation of permanent impairment, if the impairment is contained therein."

The constitutional provisions at play are found in § 18 of the Kansas Constitution Bill of Rights and the Fourteenth Amendment of the United States Constitution.

Section 18 of the Kansas Constitution Bill of Rights states: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." Remedy by due course of law as used in § 18 means "reparation for injury, ordered by a tribunal having jurisdiction, in due course of procedure and after a fair hearing." *Hanson v. Krehbiel*, 68 Kan. 670, Syl. ¶ 2, 75 Pac. 1041 (1904).

9

In *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 353, 789 P.2d 541 (1990), in which our Supreme Court considered the statutory cap on noneconomic tort damages, the court determined that § 18 provides "an injured party . . . a constitutional right to be made whole." As stated in *Miller v. Johnson*, 295 Kan. 636, 655, 289 P.3d 1098 (2012):  "The purpose of economic and noneconomic damages is to make the injured party whole by restoring the person to the position he or she was in prior to the injury. [Citations omitted.]"

Section 18 guarantees the right to a remedy, and it is satisfied when the Legislature provides an adequate substitute remedy, or quid pro quo (Latin for "something for something"), for the abolition of a common-law remedy. See *Injured Workers of Kansas v. Franklin*, 262 Kan. 840, 855, 942 P.2d 591 (1997).

Finally, § 18 is a fundamental constitutional right. See *Ernest v. Faler*, 237 Kan. 125, 131, 697 P.2d 870 (1985); *Bourne v. Atchison, T. & S. F. Rly. Co.*, 209 Kan. 511, 515, 497 P.2d 110 (1972); *State v. Larraco*, 32 Kan. App. 2d 996, 999, 93 P.3d 725 (2004).

The Fourteenth Amendment of the United States Constitution prohibits the deprivation "of life, liberty, or property without due process of law." Johnson argues that he had a property interest in receiving adequate workers compensation benefits sufficient to invoke Fourteenth Amendment due process protections.

Against this constitutional backdrop we examine the various iterations of our workers compensation laws, which we collectively refer to as the Act, along with related decisions from our Supreme Court and the United States Supreme Court.

10

In 1911, the Kansas Legislature first adopted workers compensation legislation. On March 14 of that year, Kansas and Washington became the first two states in the nation to establish a scheme of workers compensation for work-related injuries in exchange for relinquishment of the common-law rights of workers to bring civil tort actions against their employers for injuries caused by the negligence of their employers. Several other states quickly followed suit. Domenico Gagliardo, *The First Kansas Workmen's Compensation Law*, 9 Kan. Hist. Q. 384 (1940).

In *Howard Delivery Service, Inc. v. Zurich American Ins. Co.*, 547 U.S. 651, 662-63, 126 S. Ct. 2105, 165 L. Ed. 2d 110 (2006) (quoting P. Lencsis, Workers Compensation: A Reference and Guide 9 [1998]), the United States Supreme Court explained:

> "'[W]orkers compensation . . . involves a classic social trade-off or, to use a Latin term, a *quid pro quo*. . . . What is given to the injured employee is the right to receive certain limited benefits regardless of fault. . . . What is taken away is the employee's right to recover full tort damages, including damages for pain and suffering, in cases in which there is fault on the employer's part.'"

In 1914 our Supreme Court, in *Shade v. Cement Co.*, 93 Kan. 257, 260, 144 Pac. 249 (1914), found the Act to be constitutional, primarily because it was elective in nature.

In 1917, the United States Supreme Court considered in *New York Cent. R. Co. v. White*, 243 U.S. 188, 205, 37 S. Ct. 247, 61 L. Ed. 667 (1917), the trade-off between benefits under New York's workers compensation law and the loss of the common-law right to sue. In upholding the constitutionality of the New York act, the Court stated: "This, of course, is not to say that any scale of compensation, however insignificant on the one hand or onerous on the other, would be supportable." 243 U.S. at 205. It would

do "violence to the constitutional guaranty of 'due process of law'" if the Legislature set aside common-law tort liability "without providing a reasonably just substitute." 243 U.S. at 201.

In 1967, the Legislature changed the Act to provide immunity from suit for negligent fellow employees when the injured employee receives compensation under the Act. See L. 1967, ch. 280.

In 1974, the Legislature substantially revised the Act. Coverage under the Act became mandatory for employees working for an employer with an annual payroll over $10,000. See L. 1974, ch. 203.

In 1983, our Supreme Court upheld as constitutional the 1967 amendments to the Act in *Rajala v. Doresky*, 233 Kan. 440, 441-43, 661 P.2d 1251 (1983).

In 1987, the Act was amended to include compensation for functional impairment which had to be established by competent medical evidence. These amendments did not include a requirement to use any AMA Guides. See L. 1987, ch. 187.

In 1991 our Supreme Court decided *Bair v. Peck*, 248 Kan. 824, 811 P.2d 1176 (1991), which indirectly applies to the Act. There, the court considered the constitutionality of a provision in the Health Care Provider Insurance Availability Act, K.S.A. 40-3401 *et seq*. enacted in 1976, which abrogated the common-law vicarious liability of an employer health care provider under certain circumstances. The court stated: "No one has a vested right in common-law rules governing negligence actions which would preclude substituting a viable statutory remedy for one available at common law. The legislature can modify the common law so long as it provides an adequate substitute remedy for the right infringed or abolished." 248 Kan. 824, Syl. ¶ 11. But the

12

Legislature is restricted as to how much it may reduce an individual's right to obtain a remedy:

> "We recognize that there is a limit which the legislature may not exceed in altering the statutory remedy previously provided when a common-law remedy was statutorily abolished. The legislature, once having established a substitute remedy, cannot constitutionally proceed to emasculate the remedy, by amendments, to a point where it is no longer a viable and sufficient substitute remedy." 248 Kan. at 844.

In 1997, the court revisited the Health Care Provider Insurance Availability Act in *Lemuz v. Fieser*, 261 Kan. 936, 959, 933 P.2d 134 (1997), and, while again upholding the enactment, observed:

> "In summary, this court struggles with the bottom line figure as to how much a quid pro quo can be amended and still remain an adequate quid pro quo. As in *Bair*, 248 Kan. at 844, this court realizes that an original quid pro quo cannot be emasculated to a point where it is no longer a viable and sufficient substitute remedy."

In 1993, the Legislature adopted sweeping changes to the Act.

- Before 1993, an injured worker's failure to give timely notice of an accident did not bar a claim unless the employer showed prejudice. Under the 1993 change, the lack of timely notice barred a claim even if the lack of timely notice did not prejudice the employer.
- Before 1993, shoulder injuries were treated as permanent partial general disabilities. Under the 1993 changes, a shoulder injury became a scheduled injury for which compensation amounted to 2/3 of the worker's average weekly wage for 225 weeks, regardless of the worker's lost earning capacity due to the inability to perform the type of work performed before the accident. Such an award is

13

typically less than what an injured worker would have received under the pre-1993 law.

- Before 1993, an injured worker's Social Security retirement benefits were an offset against workers compensation benefits received. Under the 1993 changes, the offset was expanded to include the employer's contribution (and apparently the earnings thereon) to any private retirement plan.

- The 1993 changes disallowed recovery for a preexisting injury even though the aggravation of the injury was caused by work-related activity.

- The 1993 changes repealed an injured worker's right to vocational rehabilitation.

- The 1993 changes limited the healing period for scheduled injuries solely to those involving amputations.

- The 1993 changes set the top wage rate for computing an injured worker's wage at $450 per week, regardless of the worker's actual wages.

- The 1993 changes set a $50,000 cap on compensation for a functional impairment regardless of the severity of the worker's impairment.

- The 1993 changes made conclusive the prior presumption against work disability when the injured worker earns a comparable wage. See L. 1993, ch. 286.

In 1997, our Supreme Court decided *Injured Workers*, in which the court reviewed the 1993 legislative changes. In analyzing the due process claim, the court applied a two-step test in determining whether the legislative changes were constitutionally sound. For the legislation to stand, both of the following two questions must be answered in the affirmative: (1) Is the legislative change reasonably necessary in the public interest to promote the general welfare of the state? (2) Has the Legislature provided an adequate substitute remedy to replace the remedy that was restricted? 262 Kan. at 854. The court drew extensively on its decision in *Bair* and quoted the above cited language from *Bair* and from *Lemuz*. The court concluded:

14

"While several of the amendments at issue do restrict an employee's right to receive workers compensation benefits, several other amendments have been enacted with the intent to expand an employee's rights. (However, the expansion pales in comparison to what was taken away.)

"With these rights still available to injured workers under the amended Act, it cannot be said that the Act, which originally provided an adequate substitute remedy for the abrogation of an employee's common-law right to sue an employer for negligence, has been emasculated to the point where it is no longer an adequate quid pro quo." *Injured Workers*, 262 Kan. at 888.

In his dissent, Justice Allegrucci observed: "I am unable to determine at what point, if any, the majority would conclude the legislature went too far in altering a substitute remedy." 262 Kan. at 889 (Allegrucci, J., dissenting).

In 2011, the Legislature again enacted major revisions to the Act which reduced the employer's liability to pay compensation to injured workers.

- The revision to the Act effectively reversed our Supreme Court's holding in *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 610, 214 P.3d 676 (2009), and imposed on injured workers the duty to mitigate the employer's liability to pay compensation for a work disability by seeking post-injury employment.
- K.S.A. 44-501 shifted its focus from compensation for injured workers to disallowances and reductions predicated on fault-based concepts familiar to tort law.
- K.S.A. 44-508(f)(2) was changed to adopt the prevailing factor standard for causation. More on this later. Injured workers now have the burden of proving that a work-related accident or repetitive trauma was the primary factor in causing their injury.

15

- Under the 2011 version of K.S.A. 44-508(f)(2), "An injury is compensable only if it arises out of and in the course of employment. An injury is not compensable because work was a triggering or precipitating factor. An injury is not compensable solely because it aggravates, accelerates or exacerbates a preexisting condition or renders a preexisting condition symptomatic." Under this provision, workers are not entitled to benefits when a work accident causes a dormant condition to become symptomatic and disabling. The work accident must be the prevailing factor in causing the injury or the medical condition and the resulting disability or impairment.

- Under the 2011 version of K.S.A. 44-508(f)(3)(A), injuries arising out of neutral risks, personal risks, and idiopathic causes are not compensable. This nullifies previous cases allowing compensation in those instances if the nature of employment enhanced the risk of harm. See *Hensley v. Carl Graham Glass*, 226 Kan. 256, 597 P.2d 641 (1979).

- As noted earlier, under the 1993 amendments, the lack of timely notice of an accident barred a claim even if the employer was not prejudiced by the tardy notice. Further, notice had to be provided within 10 days of an accident. But under the 1993 amendments, the 10-day notice requirement could be extended if the claimant showed good cause. The 2011 amendments eliminate the good cause extension and compel the absolute denial of a claim unless notice is given within 30 days after the accident or 20 days from the date medical treatment is sought, whichever date is *earlier*. Under the 2011 version, if the worker is no longer employed by the employer from whom benefits are sought, notice must be given within 20 days after the last day of actual work for the employer.

- Before 2011, K.S.A. 44-525 provided that an employer's right to medical treatment reasonably necessary to cure and relieve the effects of an injury was not limited by time or amount. But the amended K.S.A 44-525 prohibits an award for

16

future medical care unless it is proven that the need is probable, which is difficult for many medical experts to predict.

- The 2011 version of K.S.A. 44-510k(a)(3) created a presumption that medical care is no longer needed as a result of a work injury if no treatment is received within two years from the date of an award for future medical care. This allowed the employer to obtain a postaward order terminating the worker's future medical rights. The burden is now on the injured worker to come forward with competent medical evidence to overcome the presumption.

- The 2011 version of K.S.A. 44-510e measured work disability by calculating the difference between the average weekly wage the employee was earning at the time of the injury and the average weekly wage the employee was capable of earning after the injury. Under the prior law, the comparison was to the injured worker's actual post-injury wage. Moreover, an injured worker must now demonstrate a functional impairment in excess of 7.5% to the whole person before a work disability claim can be made. Combining this threshold with the lower ratings provided in the Sixth Edition to the AMA Guides makes recovery for a work disability rare. For someone like Johnson, a work disability claim would not be possible if the worker is unable to return to work because a 6% functional impairment rating is below the work disability threshold.

- The 2011 version of K.S.A. 44-523(f)(1) allows dismissal with prejudice of claims for lack of prosecution that do not reach trial or settlement within three years of the filing date, even if the injured worker has not reached maximum medical recovery within that period.

- The 2011 version of the Act provided several amendments that favored employees: (1) temporary partial disability benefits can now be collected for scheduled injuries; (2) the maximum recovery for permanent partial disability was increased from $100,000 to $130,000; and (3) the cap for permanent total disability was raised from $125,000 to $155,000. But Johnson argues that these

17

changes are meaningless for those workers who no longer have viable claims because of the new limits on compensability.

- Under the 2011 version of the Act, the Fourth Edition of the AMA Guides continued in effect. See L. 2011, ch. 55.

In 2013, the Legislature further amended the Act by adopting the Sixth Edition of the AMA Guides for measuring permanent impairment from injuries occurring on or after January 1, 2015. See L. 2013, ch. 104, §§ 8, 9.

In 2015, SB167 was introduced in an effort to reverse the 2013 adoption of the Sixth Edition of the AMA Guides. The Senate Commerce Committee conducted hearings on the bill, which attracted considerable attention. Secretary of State Kris W. Kobach, a former law school professor who taught constitutional law for 15 years, supported the bill to discontinue use of the Sixth Edition of the AMA Guides. His written submission to the committee included the following points:

- "[A]ny fair constitutional analysis of the [shift from the Fourth Edition to the Sixth Edition of the AMA Guides] will yield the conclusion that employees are denied due process for certain injuries." If the quid pro quo justifying an injured worker's denial of access to the courts for relief "disappears or becomes inadequate, then the exclusive remedy rule dissolves. Due process requires that the employee must have some avenue to seek a meaningful remedy."
- The Sixth Edition "reduces some classes of injuries to zero compensation" and "reduces other injuries to pathetically inadequate compensation levels, by anyone's reckoning."
- The Sixth Edition materially changed compensation awards over what was awarded under the Fourth Edition for certain injuries even though "nothing

18

changed in this area of medicine between the publications of the 4th and 6th Editions."

- "Kansas is now the only state in the union that combines the 6th Edition with the prevailing-factor rule. That puts Kansas in a class by itself, and it results in a denial of due process to Kansas workers."

- "[T]he 6th Edition takes away from the administrative judge the ability to tailor a remedy to the specific circumstances of a particular case. It replaces a range of values with a one-size-fits-all approach. If the employee loses the ability to have the decision-maker consider the specific facts of his case and modify the remedy accordingly, he has been denied due process."

Professor Bill Rich, James R. Ahrens Chair in Torts and Constitutional Law and Professor of Law at the Washburn University School of Law, also provided testimony in support of the restoration of the Fourth Edition. He stated:

> "Because of changes made in the new edition of the AMA Guides, some injured workers no longer receive a '*quid pro quo*' (or adequate substitute) for their traditional right of recovery when they experience certain work-related injuries. As a result, the Kansas Workers Compensation Act no longer provides an adequate substitute for the lost right to a jury trial. Because no valid remedy at law remains for this category of injured workers, they will not receive the protection that the Kansas Bill of Rights guarantees."

Litigators on both sides—representing claimants and representing employers—testified in support of the bill. Support came from the Mayor/CEO of the Wyandotte County/Kansas City Unified Government, as well as numerous employers from around the state. Opposition to the bill came from other business owners and business groups around the state, including the Kansas Chamber which suggested that the committee "not succumb to the argument over constitutionality. Constitutionality arguments are a dime a dozen." Opposition was also voiced by the American Medical Association and the Kansas

Medical Society. Larry G. Karns, the Director of the Division of Workers Compensation of the Kansas Department of Labor, stated that the Department "does not have concerns with reverting to the use of the 4th Edition." He noted:

> "The current issue before the legislature is the edition of the AMA Guides to use for impairment ratings. Which Guide to use impacts the level of benefits awarded to the employee. The use of the 6th Edition in place of the 4th Edition will result in lower impairment ratings and an even greater reduction in workers benefits. The 2011 Amendments did not include adoption of the 6th Edition. The 6th Edition was adopted in 2012 legislation. Reverting back to the 4th Edition will return the formula back to where it was when the 2011 amendments were negotiated and enacted."

The Legislature failed to adopt S.B.167.

On January 1, 2015, the Sixth Edition of the AMA Guides came into effect. Johnson's accident occurred about nine months later on October 16, 2015.

ANALYSIS

In considering Johnson's constitutional argument, we apply the two-part test from *Injured Workers*: (1) Is the change in the Act reasonably necessary in the public interest to promote the general welfare of the people of Kansas? (2) Does the Act in its current form provide an adequate substitute remedy for an injured worker's right to bring a common-law action for the recovery of injuries and damages? For the Act in its present form to pass constitutional muster, both questions must be answered in the affirmative.

In the first part of the test we determine "whether the legislative means selected . . . has a real and substantial relation to the objective sought." *Injured Workers*, 262 Kan. at 854. Here, the "legislative means selected" is the adoption of the Sixth Edition of the

20

AMA Guides. As stated in *Bonin v. Vannaman*, 261 Kan. 199, 217, 929 P.2d 754 (1996): "The first question in a due process analysis is whether there is a significant public interest to justify [the statutory amendment] and whether this [amendment] has a real and substantial relation to the objective sought." Our Supreme Court has explained that this step in the analysis "is similar to a rational basis test." *Lemuz*, 261 Kan. at 949. To supply a rationalization for the adoption of the Sixth Edition of the AMA Guides, "[a]ll the State [has] to do [is] offer '*any* state of facts [which] reasonably may be conceived to justify'" the change, which in our case is the change from the Fourth Edition to the Sixth Edition of the AMA Guides. *Injured Workers*, 262 Kan. at 863 (quoting *Peden v. Kansas Dept. of Revenue*, 261 Kan. 239, 252-53, 930 P.2d 1 [1996]).

This test was applied to the adoption of the Sixth Edition of the AMA Guides in our recent decision in *Pardo*. There, the court determined: "The State satisfied this low burden by showing that the amendment to the Act was justified by offering parts of the legislative history supporting that the Sixth Edition was more medically sound than the Fourth Edition." 56 Kan. App. 2d at 17. We need not rehash that analysis here because the main thrust of Johnson's argument is directed at the second test under *Injured Workers*: that the Act in its present form does not provide an adequate substitute remedy for the rights at common law that were set aside with the initial adoption of the Act.

The second step in the analysis is more stringent than the first. Even if the modification of a remedy within the Act is consistent with public policy needs under the first *Injured Workers* test, this does not satisfy due process concerns. There still must be an adequate substitute remedy conferred on those individuals whose rights are adversely affected. *Miller*, 295 Kan. at 657. If a legislative amendment to the Act reduces the remedy or makes it more difficult to obtain a remedy, it is the task of the courts to determine if the revised Act still provides an adequate remedy. If not, the quid pro quo is

21

inadequate and the legislative amendment violates due process. *Injured Workers*, 262 Kan. at 856.

This notion of an adequate quid pro quo is fundamental to the constitutionality of the Act. The Act created a system in which an injured worker trades the right to a common-law tort recovery for a work-related injury for a fixed and relatively prompt payment for such injuries after an administrative hearing and without the need to show the employer's negligence, albeit also without compensation for any pain and suffering or punitive damages for willful or wanton conduct. As recognized in *New York Cent. R. Co.*, it would do "violence to the constitutional guaranty of 'due process of law'" if the Legislature set aside common-law tort liability "without providing a reasonably just substitute." 243 U.S. at 201.

The changes to the Act over the years have been found constitutional by our Supreme Court, but its most recent decision doing so came in 1997 in *Injured Workers*, in which the court upheld the 1993 amendments. Since then there were substantial amendments to the Act in 2011 and again in 2013 when the Sixth Edition of the AMA Guides was adopted, effective January 1, 2015.

When our Supreme Court last considered the constitutionality of the Act, it observed that "the expansion [of workers' rights under the Act] pales in comparison to what was taken away." 262 Kan. at 888. Nevertheless, the court concluded that "it cannot be said that the Act, which originally provided an adequate substitute remedy for the abrogation of an employee's common-law right to sue an employer for negligence, has been emasculated to the point where it is no longer an adequate quid pro quo." *Injured Workers*, 262 Kan. at 888. To this, Justice Allegrucci wondered what it would take for the court to conclude that "the legislature went too far." 262 Kan. at 889 (Allegrucci, J., dissenting).

The gradual erosion of the fair exchange between rights under the Act and common-law rights to tort recovery have, for the injured worker, amounted to death by a thousand paper cuts. What is the last slice that tips the balance from a fair exchange of rights and remedies to one that is unconstitutionally inadequate from the injured worker's point of view?

While our Supreme Court declared that the tipping point had not been reached with the 1993 amendments, we conclude that the tipping point has now been reached with the adoption of the Sixth Edition of the AMA Guides. We do not opine on the constitutionality of the Act as amended in 2011, though it is clear that those amendments at least moved the Act closer to the tipping point. But adoption of the Sixth Edition of the AMA Guides leaves the injured worker who suffers a permanent impairment in a situation not unlike that of Monty Python's Black Knight.

As noted earlier, with the 2011 amendments claimants' rights to recovery were diminished in a number of ways:

Claimants are now required to mitigate the employer's liability for compensation payments, an obligation that the Act had not specifically imposed before 2011. See L. 2011, ch. 55.

Under the 2011 amendments, the focus of the Act, as expressed in its first provision, shifted from the right of claimants to compensation for work-related injuries to the various fault-based provisions available to the employer for denying compensation. For example, injuries from horseplay among coworkers formerly was compensable in some circumstances. See *Jordan v. Pyle, Inc.*, 33 Kan. App. 2d 258, 101 P.3d 239 (2004). Now, injuries resulting from horseplay are not compensable under any circumstances. Previously, an employee's refusal to submit to a drug test was grounds for refusing

benefits if the employer had probable cause to believe the employee was under the influence of drugs. See the Board's decision in *Anderson v. Custom Cleaning Solutions*, No. 1,070,269, 2016 WL 5886183 (Kan. WCAB September 19, 2016). Now, an employer can deny benefits regardless of whether the employer has probable cause to believe the employee was actually under the influence of drugs when the work accident occurred so long as the employer has a policy requiring testing and the employee refuses the test.

The 2011 amendments adopted the prevailing factor rule for determining causation. The work-related injury must now be the prevailing factor in the injury. This narrowed the concept of causation from the pre-2011 Act. See *Nam Le v. Armour Eckrich Meats*, 52 Kan. App. 2d 189, 364 P.3d 571 (2015). The pre-2011 standard required a showing of "some causal connection between the accidental injury and the employment." *Siebert v. Hoch*, 199 Kan. 299, 303, 428 P.2d 825 (1967).

A claim for aggravation of a preexisting condition is no longer compensable. Nor is a claim for injuries arising out of a neutral risk, a personal risk, or an idiopathic cause. The Act previously allowed compensation for the aggravation of a preexisting condition. See *Demars v. Rickel Mfg. Corp.*, 223 Kan. 374, 573 P.2d 1036 (1978). Injuries cause by neutral risks had been compensable in the past. See *McCready v. Payless*, 41 Kan. App. 2d 79, 200 P.3d 479 (2009). Likewise, injuries from idiopathic causes had been compensable before this amendment. See *Graber v. Dillon Companies*, 52 Kan. App. 2d 786, 377 P.3d 1183 (2016), *rev. granted* 306 Kan. 1317 (2017).

The time for providing a notice of accident can no longer be extended for good cause shown. A claim will be denied if the Act's strict notice deadlines are not met.

An award for future medical treatment is not permitted under the 2011 amendments absent a showing that future medical care will probably be needed. See *Woods v. Farmers Insurance Group, Inc.*, No. 116,184, 2017 WL 1296136, at *7 (Kan. App. 2017) (unpublished opinion). In *Woods*, the court observed:

> "The 2011 amendments to the Workers Compensation Act were significant in many ways, and these provisions represented a departure from prior law. Before the 2011 amendments, claims for future medical benefits were left open as a matter of right— meaning an award for compensation always included the possibility of future medical benefits. [Citations omitted.] . . . Here, the legislature reversed the general policy that future medical benefits be left open to a general policy in which further medical benefits would not be available after maximum medical improvement unless the employee proved that the need for future treatment was probable."

Moreover, it is now presumed that medical care is no longer needed if no treatment is received within two years from the date of an award for future medical care.

In calculating an entitlement to work disability, the threshold for such a claim has been raised. Now, a claimant's functional impairment must be in excess of 7.5% to the whole person to allow a work disability claim. K.S.A. 2015 Supp. 44-510e(a)(2)(C).

A claim can now be dismissed with prejudice for lack of prosecution if it is not tried or settled within three years of the filing date, even though the claimant had not been dilatory in pursuing the claim, had not abandoned the claim, and has not reached maximum medical recovery. See *Glaze v. J.K. Williams, LLC*, 53 Kan. App. 2d 712, 390 P.3d 116, *rev. granted* 306 Kan. 1317 (2017).

An injured worker is entitled to medical care "reasonably necessary to cure and relieve the effects of the injury." K.S.A. 2015 Supp. 44-510h. But the employer has the

25

right to designate the treating physician and the injured employee must wait for the employer to authorize treatment, which delays the receipt of prompt care.

Economic loss is compensated, but only partially. Temporary total disability compensation is paid for 2/3 of the average weekly wage with a cap of 75% of the state's average weekly wage. See K.S.A. 2015 Supp. 44-510c(a)(1). Here, the applicable maximum claim was $610 per week. Taking Johnson's circumstances as an example, he earned considerably more than the state's average weekly wage. Thus, his recovery was less than the 2/3 of his actual wage loss for the six months he was unable to work.

When one considers the Act as a whole, including the major amendments made in 1993 and in 2011, we conclude that an adequate substitute remedy no longer remained after the adoption of the Sixth Edition of the AMA Guides.

There is a significant difference between the Fourth Edition and the Sixth Edition of the AMA Guides. The Sixth Edition shifts the focus from functional impairment that affects job performance to basic standards of health. As noted by the authors, the Sixth Edition "introduces a paradigm shift in the assessment of impairment" by introducing a new definition of functional impairment. AMA Guides Sixth Edition, p. 3. The model introduced in the Sixth Edition is not geared specifically to measuring functional impairment of an injured worker, but rather it is designed as a multipurpose classification intended for a wide range of uses. AMA Guides Sixth Edition, p. 5. The assessment of functional impairment in the Sixth Edition is no longer tied to the ability to do activities associated with work. Instead, when it comes to functional impairment the focus is on life-care activities. A disability evaluation "must be further integrated with contextual information typically provided by nonphysician sources regarding psychological, social, vocational, and avocational issues." AMA Guides Sixth Edition, p. 6.

26

The new definition of functional impairment is inconsistent with the Act, specifically in the assessment of permanent partial disability. Under the Act, compensation is based on the worker's disability. Disability refers to the effect of impairment on the ability to perform a job or task. A disability under the Act may be temporary or permanent, partial or total. Permanent total disability—defined in K.S.A. 2015 Supp. 44-510c(a)(2)—exists when the injury has rendered the worker completely and permanently incapable of engaging in any type of substantial gainful employment. See *Casco v. Armour-Swift-Eckrich*, 283 Kan. 508, 526, 154 P.3d 494 (2007). When permanent total disability follows permanent partial disability, compensation is paid as provided in K.S.A. 2015 Supp. 44-510d and K.S.A. 2015 Supp. 44-510e. See K.S.A. 2015 Supp. 44-510c(c). This method of compensation is consistent with the Act's overall purpose of compensating the injured worker for the loss of earning power.

But the use of the Sixth Edition conflicts with this principle by measuring disability in terms of the ability to perform activities of daily living rather than measuring an impairment in terms of the inability to do a job at work. Rather than focusing on the impairment in terms of the ability to work, the Sixth Edition describes an impairment rating as a "consensus-derived percentage estimate of loss of activity reflecting severity for a given health condition, and the degree of associated limitations in terms of [activities of daily living]." AMA Guides Sixth Edition, p. 5. Activities of daily living are described in the Sixth Edition as basic self-care activities such as bathing, showering, dressing, eating, functional mobility, personal hygiene, toilet hygiene and management, sleep, and sexual activity. AMA Guides Sixth Edition, p. 7. None of the listed activities measures tasks with physical demands associated with work such as standing, walking, bending, squatting, twisting, climbing, carrying, or lifting.

The Fourth Edition also described activities of daily living, and in doing so, it specifically included "work activities." AMA Guides Fourth Edition, p. 1. It identified

27

activities that required physical demands often associated with a work setting such as standing, walking, stooping, squatting, lifting, pushing, lifting, and carrying. AMA Guides Fourth Edition, p. 317. By including specific functional and intrinsic physical activities into the description of activities of daily living, the Fourth Edition provided a tool to measure impairment and disability in terms related to the ability to do work. With the adoption of the Sixth Edition, the focus has shifted to measuring impairment in terms of activities of daily living. Any reference to work or work-related physical activities has been eliminated from the examples of activities of daily living provided in the Sixth Edition.

The Sixth Edition provides concrete impairment ratings that leave no room for the knowledge and expertise of the evaluating physician. In contrast, the Fourth Edition allowed physicians to use their experience, training, skill, and thoroughness in examining the patient in applying the Guides. AMA Guides Fourth Edition, p. 3. The Fourth Edition explained that using these attributes and involving the physician in the evaluation process "compose part of the 'art' of medicine, which, together with a foundation in science, constitute the essence of medical practice." AMA Guides Fourth Edition, p. 3.

With the legislation adopting the Sixth Edition, K.S.A. 2015 Supp. 44-510e(a)(2)(B) specifically provides:

> "The extent of permanent partial general disability shall be the percentage of functional impairment the employee sustained on account of the injury as *established by competent medical evidence and based on the fourth edition* of the American medical association guides to the evaluation of permanent impairment, if the impairment is contained therein, until January 1, 2015, *but for injuries occurring on and after January 1, 2015, based on the sixth edition* of the American medical association guides to the evaluation of permanent impairment, if the impairment is contained therein." (Emphases added.)

28

The previous versions of the Guides deferred to the physician's discretion in providing an impairment rating. They left room for adjustments needed to meet the evolving demands of medical science. See *Milpitas United School District v. Workers Compensation Appeals Board*, 187 Cal. App. 4th 808, 823, 115 Cal. Rptr. 3d 112 (2010) (physician discretion was an integral part of past versions of the AMA Guides). The statute no longer refers to "competent medical evidence" when dealing with injuries after January 1, 2015. This discretion has been removed from the Sixth Edition.

The Guides should measure the extent of permanent impairment, which directly relates to the ability to continue working—a driving factor behind the Act.

> "[R]ecovery for loss of earning power is a basic purpose of the act. In accordance with this principle we conclude a workman is entitled to recover an award equal to the percentage of his physiological capabilities lost by reason of an injury occurring within the scope of his employment. Stated more distinctly, he should recover his functional disability." *Anderson v. Kinsley Sand & Gravel, Inc.*, 221 Kan. 191, 196, 558 P.2d 146 (1976).

But under the Sixth Edition of the AMA Guides, impairment ratings are 40% to 70% lower than those provided in the Fourth Edition. According to Dr. Koprivica, there is no scientific support for the reduced ratings in the Sixth Edition. In amending K.S.A. 2015 Supp. 44-510e(a)(2)(B), the Legislature also eliminated any reliance on competent medical evidence to measure impairment and instead refers exclusively to establishing impairment based on the Sixth Edition of the AMA Guides. The Legislature's decision to adopt the Sixth Edition and slash the amount of permanent partial disability compensation through lower impairment ratings has deprived the injured worker of a basic purpose of the Act, which is to restore lost earning capacity.

29

When enacting the Act, "[w]hat the Legislature had in mind was compensation for loss of earning power as a workman as a result of injury." *Gorrell v. Battelle*, 93 Kan. 370, 375, 144 P. 244 (1914). Because compensation for permanent partial impairment is a necessary and essential component of the Act's quid pro quo, the drastic reduction of compensation for permanent partial impairment for injured Kansas workers has tipped the Act over the constitutional edge.

In his amicus brief, the Kansas Attorney General directs us to two letters and testimony provided to the Legislature by Dr. J. Mark Melhorn and Dr. Peter Bieri who supported the use of the Sixth Edition. They testified before the Committee on Commerce in opposition to S.B.167, which called for the reinstatement of the Fourth Edition. Their testimony supports the rather easily met first constitutional test under *Injured Workers*: whether the change in the Act is reasonably necessary in the public interest to promote the general welfare of the people of Kansas. Their testimony does not address the adequacy of the quid pro quo necessary to sustain the constitutionality of the enactment.

The Attorney General also asserts that Johnson failed to show that the quid pro quo is constitutionally insufficient because he has not demonstrated that he would have recovered more compensation in a common-law tort action than he received under the current version of the Act using the Sixth Edition. We are not persuaded by this assertion.

The challenge here is not an as-applied challenge. Johnson claims the adoption of the Sixth Edition of the AMA Guides is facially unconstitutional and merely uses his situation as an example of the unconstitutional scheme.

Besides, the Attorney General's argument presents an insurmountable barrier for any injured worker. The Act establishes an administrative procedure that makes no provision for calculating the comparative fault of the injured worker, the employer, and

30

third parties who may have contributed to cause the accident and resulting injuries. There is no provision for developing and documenting evidence of conduct on the part of the employer or a third party that could be the basis for a claim of punitive damages in a common-law tort action. There is no provision for documenting evidence of noneconomic damages that otherwise would be recoverable in a tort action. There is no discovery available to a claimant on these issues, so there could be nothing in the administrative record with which to measure an actual award against a hypothetical common-law recovery.

As a final point on this issue, what our injured workers have given up in exchange for our administrative process under the Act is the *right to seek* recovery in a common-law tort action presented in a public trial to a jury of their peers. We have traditionally viewed this exchange of rights strictly in economic terms. The economic outcome of the administrative process is certainly the key element in measuring the value of the administrative side of the bargain. But in measuring the value of the other side of the bargain, those who have participated in trials of tort actions, either as lawyers or as judges, know that justice involves more than the ca-ching of a cash register.

In a public trial, plaintiffs seek the recognition of their peers of the propriety of their conduct and a recognition of the misconduct of their adversaries. They want their community to know the consequences of that misconduct on their lives and their fortunes. They want a public answer to the common question from friends and neighbors when they learn of the accident: "So what happened, and who's at fault?" In short, they want to be heard. As Linda Loman said of her husband in Act I of Arthur Miller's *Death of a Salesman*:

"I don't say he's a great man. Willy Loman never made a lot of money. His name was never in the paper. He's not the finest character that ever lived. But he's a human being,

31

and a terrible thing is happening to him. So attention must be paid. . . . Attention, attention must finally be paid to such a person."

Answers must not only be uncovered but publicly expressed. For an injured plaintiff the value of a public trial of a common-law tort action encompasses all these things. Wrongdoing must be uncovered and its consequences laid bare. Attention must be paid.

The Sixth Edition of the AMA Guides significantly reduced the amount of benefits an injured worker with a permanent impairment is entitled to receive and resulted in a drastic change to the Act. We hold that with the adoption of the Sixth Edition of the AMA Guides, the Act has been emasculated to the point that it is no longer an adequate quid pro quo for injured workers who suffer a permanent impairment as a result of an injury occurring on or after January 1, 2015. The Act no longer provides an adequate substitute remedy for the abrogation of an injured worker's common-law right to sue an employer for negligence. The Legislature went too far with the adoption of the Sixth Edition, and we agree that the Act no longer comports with due process for injured workers who sustain a permanent impairment as a result of an injury occurring on or after January 1, 2015.

THE APPROPRIATE RELIEF

The issue before us involves only a challenge to the adoption of the Sixth Edition of the AMA Guides as of January 1, 2015. In devising a remedy, we are guided by a provision set forth in the Act. In K.S.A. 44-574(b), the Legislature provided a severability clause. This clause provides a remedy in the event that provisions of the Act are found to be invalid. K.S.A. 44-574(b) provides:

"If any provision or clause of this act or application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are declared to be severable."

Our Supreme Court has considered whether it is proper to sever a provision from a statute to uphold the remaining statutory provisions as constitutional. Each time, this court has emphasized that the determination of whether the provision may be severed "'depends on the intent of the legislature.' [Citations omitted.]" *State v. Limon*, 280 Kan. 275, 302, 122 P.3d 22 (2005); see *State v. Carpenter*, 231 Kan. 235, 240-41, 642 P.2d 998 (1982); *Gumbhir v. Kansas State Board of Pharmacy*, 228 Kan. 579, 588, 618 P.2d 837 (1980). And although the decision to strike language from a statute does not depend on the presence of a severance provision, "'[t]he enactment of a severability clause in a statute or series of statutes evidences the intent of the legislature that if some portion or phrase in the statute is unconstitutional, the balance shall be deemed valid.' [Citation omitted.]" *Limon*, 280 Kan. at 304.

Here, the Legislature unequivocally expressed its intent that if a portion of the Act is found to be invalid, the remaining provisions of the Act should stand and be applied. Accordingly, the proper remedy is to strike the provisions in K.S.A. 2015 Supp. 44-510d(b)(23) and (b)(24) and K.S.A. 2015 Supp. 44-510e(a)(2)(B) that mandate the use of the Sixth Edition. Such a remedy will effectively reinstate the use of the Fourth Edition as the basis for determining impairment ratings. In oral arguments before us all parties agreed that this would be the appropriate remedy.

The Board's decision is reversed, and the case is remanded to the ALJ for further proceedings on Johnson's claim using the Fourth Edition of the AMA Guides.

33