NOT DESIGNATED FOR PUBLICATION

No. 122,572

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

KEVIN R. PILE,
*Appellee/Cross-Appellant*,

v.

TEXTRON AVIATION, INC., and AMERICAN ZURICH INSURANCE COMPANY,
*Appellants/Cross-Appellees*.

MEMORANDUM OPINION

Appeal from Workers Compensation Appeals Board. Opinion filed July 23, 2021. Affirmed.

*P. Kelly Donley* and *Brock J. Baxter*, of McDonald Tinker PA, of Wichita, for appellants/cross-appellees.

*Michael L. Snider*, of Snider & Seiwert, L.L.C., of Wichita, for appellee/cross-appellant.

Before POWELL, P.J., BRUNS, J., and STEVE LEBEN, Court of Appeals Judge Retired, assigned.

PER CURIAM: Kevin R. Pile sustained a work-related injury as a result of repetitive trauma arising out of his employment at Textron Aviation, Inc. (Textron). Pile filed for workers compensation benefits and received an award from an Administrative Law Judge (ALJ). However, the majority of the Workers Compensation Board of Appeals (Board) modified the ALJ's decision and awarded additional benefits. Thereafter, Textron filed a petition for judicial review in this court.

In its petition for judicial review, Textron and its workers compensation insurance carrier contend that there is not substantial evidence in the record to support the Board's decision to award benefits in excess of those ordered by the ALJ. In Pile's cross-petition, he contends that the use of the American Medical Association (AMA) Guides to the Evaluation of Permanent Impairment, Sixth Edition is unconstitutional as an inadequate remedy of law under section 18 of the Kansas Constitution Bill of Rights. Because we find substantial evidence in the record on appeal to support the Board's award and because the Kansas Supreme Court has previously found the use of the Sixth Edition of the AMA Guides to be constitutional, we affirm.

FACTS

Pile works for Textron in the company's composite tooling department. As part of his job duties, Pile used power tools on a regular basis. These tools included a hand-held grinder and an oscillating orbital sander. In June 2015, Pile noticed pain and tingling in his right hand radiating up his arm. He also complained on occasion of less severe symptoms in his left hand.

Pile underwent a nerve conduction study which revealed "bilateral carpal tunnel syndrome, mild on the left and moderate in severity on the right." Subsequently, Dr. David Gwyn performed right carpal tunnel release surgery on Pile and provided conservative treatment to Pile's left extremity. On May 11, 2016, Dr. Gwyn rendered the opinion that Pile had reached maximum medical improvement. Using the Sixth Edition of the AMA Guides, Dr. Gwyn further opined that Pile had a 3% right upper extremity impairment and no left upper extremity impairment.

Evidently, the carpal tunnel release surgery had mixed results, and Pile continued to have symptoms of discomfort. As a result, Textron sent Pile to Dr. Chris Fevurly who examined him on June 7, 2017. Following the examination, Dr. Fevurly opined that Pile

had not reached maximum medical improvement in his right upper extremity and referred him to Dr. Mark Melhorn. Between September and November 2017, Dr. Melhorn examined Pile on several occasions.

In October 2017, Dr. Melhorn reported that he found "[e]vidence of mild to moderate bilateral carpal tunnel syndrome." Dr. Melhorn also found that Pile "does continue to have [carpal tunnel] symptoms right and left." Nevertheless, Pile decided not to undergo another right carpal tunnel surgical release procedure. Dr. Melhorn found that Pile had reached maximum medical improvement and, using the Sixth Edition of the AMA Guides, he found Pile had a 2% right upper extremity impairment and no impairment of his left upper extremity.

After being released from Dr. Melhorn's treatment, Pile's workers compensation attorney referred him to Dr. Pedro Murati. Over the next several months, Dr. Murati examined Pile on two occasions. On December 12, 2017, Dr. Murati diagnosed Pile with carpal tunnel syndrome and chronic regional pain syndrome in the right upper extremity but did not render a diagnosis related to his left upper extremity. Later, Dr. Murati examined Pile again and found symptoms of carpal tunnel syndrome in both his right and the left upper extremities. Eventually, Dr. Murati rendered the opinion that Pile had an 8% right upper extremity impairment and an 8% left upper extremity impairment using the Sixth Edition of the AMA Guides while noting that his impairment rating would be higher if the Fourth Edition of the AMA Guides were used.

Due to the conflicting impairment ratings given by the physicians who examined Pile, the ALJ ordered that Dr. Jarron Tilghman perform a neutral evaluation and issue an impairment rating. Between March and September of 2018, Dr. Tilghman reviewed Pile's prior medical records and examined him twice. Dr. Tilghman did not note any complaints from Pile regarding his left hand or arm during either examination. However, Dr.

3

Tilghman did note that the results of previous testing had "revealed mild carpal tunnel syndrome on the left and moderate carpal tunnel syndrome on the right."

Dr. Tilghman diagnosed Pile with pain, neuralgia, neuritis, and capal tunnel syndrome in his right upper extremity. On September 22, 2018, he rendered the opinion that Pile had a 5% right upper extremity impairment using the Sixth Edition of the AMA Guides. He also recognized that the impairment rating would be higher under the Fourth Edition of the AMA Guides. Dr. Tilghman offered no opinion regarding Pile's left upper extremity.

On October 15, 2018, the ALJ held a hearing in which the parties stipulated that Pile's injuries were the result of his work duties at Textron. In addition, Pile testified regarding his symptoms in both his right and left upper extremities. In reaching his decision, the ALJ also took into consideration the deposition testimony of Lori Halsey, R.N., Dr Murati, and Dr. Melhorn.

The ALJ issued an award on August 7, 2019. In his decision, the ALJ adopted Dr. Tilghman's opinion that Pile "suffered a 5% impairment of the right upper extremity under the 6th edition of the guides" and awarded permanent partial disability compensation benefits in the amount of $5,940. The ALJ found that "Dr. Tilghman noted a previous diagnosis in the records of mild carpal tunnel syndrome on the left side but did not rate that condition." As a result, the ALJ did not make an award for the left upper extremity. Pile timely appealed the ALJ's award to the Board.

On February 4, 2020, the Board issued its order modifying the ALJ's award. Specifically, the majority of the Board members found that Pile had a 7% impairment of the right upper extremity and a 4% impairment of the left upper extremity under the Sixth Edition of the AMA Guides. The majority also concluded that Pile had a 6% whole body functional impairment. Consequently, the Board awarded Pile $14,790.60 in permanent

4

partial disability workers compensation benefits. Thereafter, Textron filed a petition for review in this court, and Pile filed a cross-petition.

ANALYSIS

*Substantial Competent Evidence*

In its petition for judicial review, Textron contends that the award of the Board is not supported by substantial competent evidence. In particular, it argues that the majority's decision regarding Pile's functional impairment of his upper left extremity was inappropriate. Instead, it suggests that the Board should have followed the ALJ's decision by "adopting the neutral examiner's opinion" regarding Pile's impairment rating.

We review the Board's decision under the provisions of the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq. Under the KJRA, the party challenging the Board's action—in this case Textron—bears the burden of showing the Board's action was invalid. See K.S.A. 77-621(a). Here, we must review the record to determine whether the decision of the Board is supported by evidence that is substantial when viewed in light of the record as a whole. K.S.A. 77-621(c)(7). Moreover, "[t]he determination of whether the Board's findings of fact are supported by substantial competent evidence is a question of law." *Estate of Graber v. Dillon Companies*, 309 Kan. 509, 513-14, 439 P.3d 291 (2019).

The term, "in light of the record as a whole" is defined under the KJRA to mean:

"[T]hat the adequacy of the evidence in the record before the court to support a particular finding of facts shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record . . . cited by any party that supports such finding, including any determinations of

5

veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review." K.S.A. 77-621(d).

A review of the order issued by the Board reveals that both the majority and the minority carefully reviewed the conflicting evidence. In particular, we note that the majority considered and discussed at length the various opinions offered by the medical experts regarding Pile's impairment. In doing so, the majority concluded that Pile suffered impairment in both his right and left upper extremities. At the same time, the majority recognized that Pile's "right upper extremity symptoms are much more severe than his left upper extremity symptoms."

To demonstrate the thoroughness of the review by the Board, we quote the following analysis from the majority's opinion:

"The Board finds claimant sustained a left CTS injury by repetitive trauma that arose out of and in the course of his employment. Specifically, the Board concludes claimant's repetitive work activity was the prevailing factor causing his injury, need for medical treatment and resulting disability. Dr. Melhorn's notes of October 26, 2017, indicated claimant reported symptoms of left CTS. Moreover, r. Murati diagnosed claimant with left CTS.

"From the judge's orders appointing Dr. Tilghman to evaluate claimant, it is uncertain if Dr. Tilghman was asked to evaluate claimant's left upper extremity. The doctor was largely silent on whether claimant had left CTS, other than to state the nerve conduction tests revealed CTS. Dr. Tilghman was also silent on whether claimant had a left upper extremity functional impairment, which is different than stating claimant had no left upper extremity functional impairment rating.

"Although Dr. Gwyn opined claimant had no permanent left upper extremity functional impairment, the Board gives it little weight. The judge only briefly mentioned

6

Dr. Gwyn in the Award and did not consider Dr. Gwyn's rating. The parties, in their briefs and at oral argument, did not ask the Board to consider Dr. Gwyn's ratings. Dr. Gwyn stated claimant had no left upper extremity impairment but provided little explanation as to how he arrived at his opinion, even though he treated claimant's left upper extremity conservatively. "The next issue is whether claimant has a right upper extremity causalgia, or CRPS II. Drs. Murati and Fevurly diagnosed claimant with this malady. However, Dr. Murati later indicated that claimant had no functional impairment for right upper extremity CRPS. Thus, the majority of the doctors who evaluated the claimant opined he either did not have right upper extremity CRPS II or he had no functional impairment for that condition. Consequently, the Board finds claimant sustained no right upper extremity functional impairment for CRPS II.

"Determining claimant's left and right upper extremity functional impairment is a difficult and daunting task, due to divergent opinions of the experts. Dr. Murati's 8 percent left upper extremity rating is excessive, if one looks at Table 15-13, which is the table Dr. Murati used to evaluate claimant. An 8 percent places claimant in Grade Modifer 3. Grade Modifer 3 requires a test finding that claimant has axon loss, a history of constant symptoms and atrophy or weakness. Claimant did not report having constant symptoms and nerve conduction testing showed a conduction delay.

"Dr. Melhorn's opinion that claimant had no left upper extremity functional impairment is based on the premise that claimant had no left CTS, a premise which the Board has rejected. In order for claimant to be in Grade Modifier 0 of Table 15-23, he would have a normal nerve conduction test result, have a history of mild intermittent symptoms and have normal physical findings. Therefore, the Board chooses to average the ratings of Drs. Murati and Melhorn and find claimant sustained a 4 percent functional impairment to the left upper extremity for left CTS.

"With respect to claimant's right upper extremity, the Board notes the 2 percent functional impairment rating of Dr. Melhorn places claimant in Grade Modifier 1. A person in Grade Modifier 1 has a nerve conduction test finding of conduction delay, a history of mild intermittent symptoms and normal physical findings.

7

"Dr. Tilghman's 5 percent rating places claimant in Grade Modifier 2. A person in Grade Modifier 2 has test findings of motor conduction block, a history of significant intermittent symptoms and physical findings of decreased sensation.

"Dr. Murati's 8 percent right upper extremity rating places claimant in Grade Modifier 3. As indicated above, for a person to be in Grade Modifier 3, they must have test results of axon loss, a history of constant symptoms and physical findings of atrophy or weakness.

"The evidence is that claimant does not neatly fit into any of the grade modifiers. Claimant's nerve conduction results of conduction delay would place him in Grade Modifier 1; his history of ongoing symptoms would place him in Grade Modifier 2 or 3 and his physical findings would place him in Grade Modifier 2 or 3. The Board finds the evidence is that claimant is either in Grade Modifier 2 or 3. Therefore, the Board will average the 5 percent rating of Dr. Tilghman with Dr. Murati's 8 percent rating for a 6.5 percent right upper extremity functional impairment for right CTS. The Board also notes that claimant's left CTS is mild to moderate and his right CTS is moderate to severe. Claimant's right upper extremity symptoms are much more severe than his left upper extremity symptoms.

"Using Table 15-11 of the *Guides* (6th ed.), claimant's 4 percent left upper extremity functional impairment converts to a 2 percent whole person functional impairment and his 6.5 percent (rounded to 7 percent) right upper extremity functional impairment converts to a 4 percent whole person functional impairment. Then, using the Combined Values Chart, claimant has a 6 percent whole person functional impairment."

Although reasonable minds could differ on how to weigh the evidence presented in this workers compensation action, we find that there is substantial competent evidence in the record—when viewed in light of the record as a whole—to support the Board's majority decision.

The majority recognized that "Dr. Gwyn opined that claimant had no permanent left upper extremity functional impairment." But it also noted that Dr. Gwyn had

previously diagnosed Pile with "bilateral carpal tunnel syndrome" and had treated his left upper extremity in a conservative manner. In addition, the majority further discounted Dr. Gwyn's opinion regarding left upper extremity impairment because "[t]he parties, in their briefs and at oral argument, did not ask the Board to consider [his] ratings." The majority further found that Dr. Gwyn "provided little explanation as to how he arrived at his opinion, even though he treated claimant's left upper extremity conservatively."

Textron also argues that the majority erred in rejecting Dr. Melhorn's finding of no carpal tunnel syndrome in Pile's upper left extremity. It should be noted, however, that the majority did not reject Dr. Melhorn's opinion outright, but ultimately determined that his opinion of 0% left upper extremity impairment should be averaged with Dr. Murati's opinion of 8% left upper extremity impairment. By averaging the two, the majority determined that a 4% impairment rating of the left upper extremity was warranted. We find this approach to be reasonable given the significant conflict between the opinions rendered by the medical experts.

Regarding Dr. Murati's opinion, Textron argues that the majority should have afforded it no weight because he did not diagnose left carpal tunnel syndrome after his first examination of Pile. However, the record reflects that Dr. Murati added a diagnosis of a left upper extremity impairment after a subsequent examination. Specifically, we note that Dr. Murati testified in his deposition as follows:

"A: Now, as you see, even though nerve conduction study called for bilateral, in the end carpal tunnel syndrome is a clinical diagnosis.

"Q: Yes.

"A: Just because a study says you have it doesn't mean you really have it. That's why in my clinical report on that date I did not believe he had clinical left carpal tunnel syndrome.

9

"Q: Okay.

"A: But on the subsequent report I did say yes because it had more time to develop.

"Q: All right.

"A: And naturally so since he's favoring the right upper extremity.

"Q: Okay. And how would that likely affect his use of his left upper extremity . . .

"A: Well, just like if you have a car with electrical problems, it's going to give you some problems, but let's just say the engine is bad, too. Then you're going to have probably twice or more the trouble. It's not a good thing. Now you have two extremities involved.

"Q: Okay. So what I'm trying to get at is do you have an opinion to a reasonable medical probability as to whether the subsequent development of left carpal tunnel syndrome symptoms is causally related to the combination of his work activity and his treatment for his right carpal tunnel syndrome?

"A: Yes, I do.

"Q: Does that indicate to you and can you tell us, do you have an opinion to a reasonable professional certainty as to whether the prevailing factor causing these three separate conditions, right carpal tunnel syndrome, right complex regional pain syndrome, and left carpal tunnel syndrome, have as their prevailing factor the work activity that Mr. Pile was doing, assuming he continued working with that condition after the development of surgery and right carpal tunnel syndrome with chronic regional pain syndrome.

"A: It all started with the right hand and then went to the left.

"Q: Okay.

"A: It's all as a result of the repetitive traumas he sustained while working at Textron."

In addition, Dr. Murati's notes from his first examination of Pile list subjective complaints of "tingling" in his left hand and pain in his left wrist. As Dr. Murati explained in his deposition, his failure to provide an assessment of Pile's left upper extremity in his initial report was due to an "oversight," and this is why he subsequently amended his report to include the diagnosis. Once again, it is not our role to reweigh the conflicting evidence, and we find that the majority's findings about Dr. Murati's opinion to be supported by substantial competent evidence.

Finally, Textron argues that the majority's assessment of 8% right upper extremity impairment is too high. Evidently, Textron would have us disregard other evidence in the record and simply look to the opinions expressed by Dr. Tilghman and Dr. Melhorn. Yet again, our role is not to reweigh the evidence or replace our judgment for that of the Board. As a result, we decline Textron's invitation for us to replace our judgment for that of the Board regarding Pile's right upper extremity impairment.

*Constitutionality of K.S.A. 2020 Supp. 44-510e(a)(2)(B)*

Pile contends that K.S.A. 2020 Supp. 44-510e(a)(2)(B) is unconstitutional. As the parties are aware, the current version of the statue requires the use of the Sixth Edition of the AMA Guides to evaluate permanent impairment under the Kansas Workers Compensation Act for any injuries occurring on or after January 1, 2015. Here, it is undisputed that Pile sustained a work-related injury due to repetitive trauma beginning on June 6, 2015. As a result, the Board used the Sixth Edition of the AMA Guides in rendering the award in this workers compensation action.

Determining a statute's constitutionality is a question of law over which we have unlimited review. We are to presume statutes are constitutional and resolve all doubts in favor of a statute's validity. We are also to interpret statutes in a way that makes them constitutional if there is any reasonable construction that would maintain the Kansas

11

Legislature's intent. In other words, before striking down a statute as unconstitutional, the violation must be clear. See *Solomon v. State*, 303 Kan. 512, 523, 364 P.3d 536 (2015).

The current version of K.S.A. 2020 Supp. 44-510e(a)(2)(B)—as amended in 2013—provides as follows:

> "The extent of permanent partial general disability shall be the percentage of functional impairment the employee sustained on account of the injury as established by competent medical evidence and based on the fourth edition of the American medical association guides to the evaluation of permanent impairment, if the impairment is contained therein, until January 1, 2015, but for injuries occurring on and after January 1, 2015, based on the sixth edition of the American medical association guides to the evaluation of permanent impairment, if the impairment is contained therein."

In his brief, Pile argues that "the adoption of the Sixth Edition of the American Medical Association Guides to the Evaluation of Permanent Impairment (6th ed. 2008) [should] be deemed unconstitutional as there is no longer an adequate substitute remedy for injured workers." Although Pile does not identify a specific constitutional provision that he claims has been violated, it appears that he is arguing a violation of section 18 of the Kansas Constitution Bill of Rights. This constitutional provision states that "[a]ll persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

Pile bases his argument on *Johnson v. U.S. Food Service*, 56 Kan. App. 2d 232, 257, 427 P.3d 996 (2018), in which a panel of this court held that with "the adoption of the Sixth Edition of the AMA Guides, the Act has been emasculated to the point that it is no longer an adequate quid pro quo for injured workers who suffer a permanent impairment as a result of an injury occurring on or after January 1, 2015." However, in *Johnson v. U.S. Food Service*, 312 Kan. 597, 478 P.3d 776, 780 (2021) (*Johnson II*), the

Kansas Supreme Court reversed the panel's decision and found that K.S.A. 2020 Supp. 44-510e(a)(2)(B) does not violate section 18 of the Kansas Constitution Bill of Rights.

In *Johnson II*, our Supreme Court explained:

"We hold that the language added in 2013 does not change the essential legal standard for determining functional impairment. K.S.A. 2019 Supp. 44-510e(a)(2)(B) still requires that ratings be 'established by competent medical evidence.' The 2013 amendments merely reflect an update to the most recent set of guidelines—which serve as a starting point for any medical opinion. K.S.A. 2019 Supp. 44-510e(a)(2)(B) has never dictated that the functional impairment is set by guides. This has not changed. The key fact— percentage of functional impairment—must always be proved by competent medical evidence." 312 Kan. at 603.

Of course, as an intermediate appellate court, we are to follow the precedent established by the Kansas Supreme Court absent some indication that it is departing from its previous position. *McCullough v. Wilson*, 308 Kan. 1025, 1032, 426 P.3d 494 (2018) ("The doctrine of stare decisis recognizes that 'once a point of law has been established by a court, that point of law will generally be followed by the same court and all courts of lower rank in subsequent cases where the same legal issue is raised.'"). Significantly, Pile raises no argument that was not raised—and ultimately rejected—in *Johnson II*. Because the *Johnson II* decision was handed down by our Supreme Court only a few months ago, we have no indication that it is departing from its position regarding the constitutionality of K.S.A. 2020 Supp. 44-510e(a)(2)(B). Thus, we reject Piles' argument that the Board erred in using the Sixth Edition of the AMA Guides in this action.

CONCLUSION

In sum, we conclude that the Board's award is supported by evidence that is substantial in light of the record as a whole. While reasonable persons may differ regarding the weight to be afforded to the conflicting medical opinions contained in the

13

record, it is not our role to reweigh the evidence. We also conclude that Pile has failed to establish that K.S.A. 2020 Supp. 44-510e(a)(2)(B) is unconstitutional. Thus, we affirm the award entered by the Board.

Affirmed.