No. 125,592

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

WILLIAM WEAVER,
*Appellant/Cross-appellee*,

v.

UNIFIED GOVERNMENT OF WYANDOTTE COUNTY,
*Appellee/Cross-appellant*.

SYLLABUS BY THE COURT

1.

To determine a functional impairment rating for scheduled injuries under K.S.A. 44-510d(b)(23), the fact-finder should begin with the Sixth Edition of the American Medical Association Guides to the Evaluation of Permanent Impairment as a starting point and consider competent medical evidence to modify or confirm that rating, accordingly.

2.

No reduction for preexisting impairment under K.S.A. 44-501(e) is appropriate when the evidence shows that the claimant's impairment resulting from his or her current injury is different from the impairments for which the claimant has previously been compensated.

Appeal from Workers Compensation Appeals Board. Oral argument held August 15, 2023. Opinion filed November 17, 2023. Affirmed in part, reversed in part, and remanded with directions.

*Keith L. Mark*, of Mark & Burkhead, of Mission, for appellant/cross-appellee.

*Denise E. Tomasic*, of Tomasic & Rehorn, of Kansas City, for appellee/cross-appellant.

Before WARNER, P.J., GARDNER and HURST, JJ.

GARDNER, J.: William Weaver appeals from his workers compensation award. The Workers Compensation Appeals Board (the Board) interpreted K.S.A. 44-510d(b)(23) of the Workers Compensation Act, K.S.A. 44-501 et seq. (the Act), to exclude the use of competent medical evidence when assessing an impairment rating for scheduled injuries. The Board held that the relevant statute requires use of the American Medical Association Guides to the Evaluation of Permanent Impairment (6th ed. 2008) alone. Weaver counters, and Wyandotte County agrees, that the Sixth Edition of the Guides is merely a starting point and that competent medical evidence may be considered in calculating an impairment rating of a scheduled injury. We agree as well.

The Unified Government of Wyandotte County cross-appeals, arguing that Weaver's award should have been reduced due to his preexisting impairment, in accordance with K.S.A. 44-501(e). But we find no error here. We thus affirm in part, reverse in part, and remand for further proceedings.

*Weaver's Work Injury*

In August 2018, Weaver was employed by Kansas City Water Pollution Control, which is part of the Unified Government of Wyandotte County (Wyandotte County), as a full-time plant maintenance mechanic. At the time of his relevant accident, he had worked for Wyandotte County for over 30 years.

On August 20, 2018, while working, Weaver and coworkers were trying to remove a wall made of cinder blocks and a steel beam. The beam was so heavy that machinery was needed to lift it. While removing the wall, the steel beam shifted and wedged Weaver's right hand between the beam and the wall. Because of the beam's weight, Weaver could not remove his hand. His coworkers had to use the machine to move the

2

beam so Weaver's hand could be extricated. Because of this accident, both sides of Weaver's right hand were injured below his pinky and ring fingers, as well as his right wrist and thumb. During and after the accident, Weaver experienced pain in his right hand and wrist and timely reported the accident to his supervisors.

Because of this injury, Weaver said he had significant pain and considerable swelling in his right hand, from the back to the front of his hand in the area below his pinky and ring fingers, and in his right wrist and thumb. The injury led to a lack of circulation and sensitivity to touch. As a result, Weaver has difficulty performing basic self-hygiene activities such as brushing his teeth, brushing his hair, and washing his body. Activities requiring pushing or pulling with his right hand increase his symptoms. Prolonged activities also increase his pain. Weaver described his pain as a deep throbbing, which limits his ability to hold and grasp objects. This struggle with his grip and the pain makes tasks at work such as using power tools, a hammer, and other objects, difficult. The thumb pain and decreased function impair his ability to perform his job because it affects his use of tools and compromises his ability to push, pull, and climb, and decreases his range of motion.

Weaver received medical treatment for his injuries then returned to his regular work duties on September 15, 2018. At the time of his accident, Weaver's wages entitled him to the maximum benefit rate of $645 a week.

*Weaver's Prior Work-Related Injuries*

Weaver had four work injuries to his right upper extremity before his current (August 2018) injury to that same extremity:

1. March 2009, settled based on a 10% permanent partial impairment to Weaver's right middle finger;

2. May 2011, settled based on a 12% permanent partial impairment to Weaver's right wrist;

3. March 2016 (injury to his right elbow), settled based on a 10% permanent partial impairment to his right arm; and

4. May 2016 (injury to his first and second fingers on his right hand), settled based on a 10% permanent impairment to his right hand.

Weaver testified there was no overlap between his injuries or symptoms from his August 2018 accident and those from any prior injury.

*Weaver's Medical Evaluations*

When Weaver reported his injury to his supervisors, Wyandotte County directed him to receive medical treatment with its selected clinic (State Avenue Health Care), and then with its selected orthopedic specialist (Dr. J. B. Moore). Wyandotte County referred Weaver to Dr. Bruce Toby, an orthopedic physician at the University of Kansas Hospital. Weaver was also evaluated by Dr. Anne Rosenthal for treatment recommendations and by Dr. Michael Poppa for an independent injury rating. Later, Weaver was also evaluated by Dr. Vito Carabetta, who performed an independent medical evaluation (IME) of Weaver's injuries, as ordered by the administrative law judge (ALJ).

Drs. Poppa, Toby, and Carabetta all testified that Weaver had sustained new functional impairment because of his August 2018 work accident, over and above any previous impairments. We discuss their evaluations below.

1. *Dr. Poppa's Evaluation*

Dr. Poppa, Weaver's chosen doctor, testified that Weaver sustained a permanent partial impairment because of the August 2018 accident. Dr. Poppa determined that Weaver had

- a 19% permanent partial impairment to the right upper extremity if he applied only the Sixth Edition of the Guides; and
- a 28% permanent partial impairment to the right upper extremity if he applied the Sixth Edition of the Guides and used all other competent medical evidence.

When assessing these impairment ratings, Dr. Poppa considered all of Weaver's ongoing symptoms and limitations.

Dr. Poppa determined that Weaver had

- a 30% combined overall impairment of the right upper extremity before his August 2018 work related injury, using Weaver's prior settlements and the Guides as a basis;
- after the August 2018 injury, Weaver had an overall combined impairment from his prior and current injury of 43% permanent partial impairment of his right upper extremity by using the Sixth Edition alone; and
- a 50% permanent partial impairment of his right upper extremity by using the Sixth Edition as a starting point and then adding competent medical evidence.

2. *Dr. Toby's Evaluation*

Dr. Toby, Wyandotte County's selected physician, testified that Weaver had

- a 3% impairment rating to his right upper extremity if he applied only the Sixth Edition of the Guides; and
- a 6% impairment rating if he used the Sixth Edition as a starting point and considered all the competent medical evidence.

3. *Dr. Carabetta's Evaluation*

Dr. Carabetta, the court-appointed physician who conducted an IME, found that Weaver had

- a 30% combined overall impairment of the right upper extremity before the August 2018 work related injury using Weaver's prior settlements and the Guides as a basis;
- an 8% impairment rating to his right upper extremity using the Sixth Edition of the Guides alone;
- a 10% impairment rating to his right upper extremity using the Fourth Edition of the Guides alone; and
- after the August 2018 injury, an overall combined impairment from his prior and current injury of 36% to 37% permanent partial impairment of his right upper extremity, depending on if the 8% or 10% rating, respectively, is imposed.

*The ALJ's Award*

The ALJ credited Dr. Carabetta's testimony, being persuaded by his neutral and unbiased opinion. Crediting Dr. Carabetta's rating using the Sixth Edition, the ALJ found that Weaver's August 2018 work-related injury resulted in a permanent partial impairment of 8% to his right upper extremity. In doing so, the ALJ declined to consider any ratings that were not based strictly on the Sixth Edition. The ALJ held that K.S.A.

44-510d(b)(23) requires one to use only the Sixth Edition when determining the impairment of function related to a scheduled injury, thus "competent medical evidence" is not to be considered.

The ALJ also declined to reduce Weaver's benefits for preexisting functional impairment under K.S.A. 44-501(e). Wyandotte County argued Weaver should not receive any benefits for his current injury because of his preexisting 30% impairment. But the ALJ disagreed, finding Wyandotte County "point[ed] to no expert medical evidence to support this position." Rather, the ALJ found that all three physicians testified that their impairment ratings did not include Weaver's preexisting impairment in their assessed ratings. In other words, their ratings were in addition to or independent of his preexisting impairment.

Accordingly, the ALJ awarded Weaver $10,320 in benefits; 16 weeks of permanent partial disability compensation at $645 per week. It also found that Weaver was not entitled to future medical treatment.

*The Board's Decision*

Neither party was content with the ALJ's decision. Wyandotte County sought review of the ALJ's award by the Workers Compensation Appeals Board (the Board), and Weaver did the same.

In a split decision, the Board, by a majority of three members, affirmed the ALJ's award in part and reversed in part. The Board concluded that the ALJ had erred by finding Weaver was not entitled to future medical treatment, but it affirmed the award in all other respects. Two conclusions of the Board's holding are crucial to this appeal: its application of K.S.A. 44-510d(b)(23) and K.S.A. 44-501(e).

*K.S.A. 44-510d(b)(23)*

The Board held that Weaver sustained an 8% permanent partial impairment to his right upper extremity from his August 2018 work-related accident. As had the ALJ, the Board found Dr. Carabetta's rating most persuasive because he was the court-appointed neutral evaluator.

The Board read K.S.A. 44-510d(b)(23) (the statute used to determine Weaver's impairment rating for a scheduled injury) as requiring that rating to be based solely on the Sixth Edition, to the exclusion of "competent medical evidence." The Board relied on its decision in *Butler v. The Goodyear Tire and Rubber Co.*, No. AP-00-0456-096, 2021 WL 2287732, at *4-5 (Kan. Work. Comp. App. Bd. May 27, 2021), which pointed out the differences in the plain language between the scheduled injury statute applicable here (K.S.A. 44-510d[b][23]), which does not reference "competent medical evidence," and the non-scheduled injury statute (K.S.A. 44-510e[a][2][B]), which requires use of "competent medical evidence." In *Butler*, the Board held, based on the plain language of K.S.A. 44-510d(b)(23), that only the Sixth Edition may be used to rate scheduled injuries. Under that rationale, an impairment rating for a non-scheduled injury under K.S.A. 44-510e(a)(2)(B) could be based on both the Guides and competent medical evidence, see *Johnson v. U.S. Food Service*, 312 Kan. 597, 600, 478 P.3d 776 (2021), but an impairment rating for a scheduled injury under K.S.A. 44-510d(b)(23) must be based solely on the Guides.

Two Board members dissented. John Carpinelli disagreed with the Board's interpretation of K.S.A. 44-510d(b)(23). He found use of "competent medical evidence" was mandated in part by the Sixth Edition's use of terms such as "accuracy," "precision," and "skill," stating:

"Therefore, an impairment rating assessed using the Guides must also be based on a physician's medical knowledge, skill, and abilities, in addition to validity, accuracy, precision, consistency, objectivity, medical science, measurements, test results, and medical records, not merely looking at the Guides and assigning a number."

His view is reflected in the Sixth Edition itself, which states: "The accurate use of the *Guides* requires a fundamental understanding of anatomy, physiology, pathology, and other appropriate clinical sciences along with a good understanding of the issues related to impairment and disability assessment." AMA Guides Sixth Edition, p. 23. And he found the disparate effect—that an impairment rating for a non-scheduled injury would be based on both the Guides and competent medical evidence, but an impairment rating for a scheduled injury must be determined solely on the Guides—absurd.

### *K.S.A. 44-501(e)*

Wyandotte County argued that the ALJ had erred by not reducing Weaver's award under K.S.A. 44-501(e), based on his preexisting impairments. The Board disagreed. The majority held:

"Under K.S.A. 44-501(e), an award of compensation shall be reduced by the amount of functional impairment determined to be preexisting. Under K.S.A. 44-501(e)(2)(A), in order to apply the credit for preexisting impairment, the Board must consider the percentage of functional impairment determined to be preexisting. Each physician testified their assessment of impairment was over and above Claimant's prior impairments. As such, no amount of the impairment awarded by the ALJ was preexisting."

Board member William Belden disagreed with that analysis. He argued that the Board's approach (that K.S.A. 44-501[e] did not apply because the medical evidence gave Weaver

a rating above and beyond his prior injuries) improperly ignored the plain language of the statute.

Ultimately, the Board affirmed the award but remanded for the inclusion of future medical expenses—an issue not raised on appeal. Again, neither party is content with the Board's decision. Weaver timely petitioned for judicial review of the Board's order affirming his award, and Wyandotte County timely cross-petitioned for judicial review of the Board's decision relating to preexisting impairments.

I.    K.S.A. 44-510d(b)(23) PERMITS CONSIDERATION OF COMPETENT MEDICAL EVIDENCE AND THE SIXTH EDITION OF THE GUIDES WHEN ASSESSING A FUNCTIONAL IMPAIRMENT RATING FOR A SCHEDULED INJURY.

We first consider Weaver's argument that the Board must determine a functional impairment rating under K.S.A. 44-510d(b)(23) (scheduled injuries) by looking at competent medical evidence about the claimant's condition and at the Sixth Edition of the Guides, yet it failed to do so here. Wyandotte County agrees that the functional impairment rating under K.S.A. 44-510d(b)(23) should consider both the Sixth Edition of the Guides and competent medical evidence, but it contends that Dr. Carabetta, and thus the Board by adopting his analysis, did so here.

But the Board held that K.S.A. 44-510d(b)(23) prohibits one from considering competent medical evidence when assessing an impairment rating for a scheduled injury under K.S.A. 44-510d(b)(23). The Board based its decision on the contrast between the plain language of K.S.A. 44-510d(b)(23), which governs scheduled injuries, to K.S.A. 44-510e(a)(2)(B), which governs whole body/nonscheduled injuries. The latter refers to "competent medical evidence," while the former does not.

K.S.A. 44-510e(a)(2)(B), which governs whole body/nonscheduled injuries, states:

> "The extent of permanent partial general disability shall be the percentage of functional impairment the employee sustained on account of the injury *as established by competent medical evidence and* based on the fourth edition of the American medical association guides to the evaluation of permanent impairment, if the impairment is contained therein, until January 1, 2015, but *for injuries occurring on and after January 1, 2015, based on the sixth edition of the American medical association guides* to the evaluation of permanent impairment, if the impairment is contained therein." (Emphasis added.) K.S.A. 44-510e(a)(2)(B).

The Board found that the plain language of K.S.A. 44-510d(b)(23) requires the functional impairment for a scheduled member to be determined solely by using the Sixth Edition, as it says so and omits any reference to "competent medical evidence":

> "Loss of or loss of use of a scheduled member shall be based upon permanent impairment of function to the scheduled member as determined using the fourth edition of the American medical association guides to the evaluation of permanent impairment, if the impairment is contained therein, until January 1, 2015, but *for injuries occurring on and after January 1, 2015, shall be determined by using the sixth edition of the American medical association guides* to the evaluation of permanent impairment, if the impairment is contained therein." (Emphasis added.) K.S.A. 44-510d(b)(23).

Both parties agree that the Board's interpretation of K.S.A. 44-510d(b)(23) was erroneous. K.S.A. 44-556(a) directs that final orders of the Workers Compensation Board are subject to review under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq., as amended. The standard of review varies depending on the issue raised. See K.S.A. 77-621(c)(4) (permitting relief if the agency has erroneously interpreted or applied the law). Because this issue presents a question of statutory interpretation, we review it de novo. See *Johnson*, 312 Kan. at 600.

11

The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be determined. An appellate court first tries to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language. *Montgomery v. Saleh*, 311 Kan. 649, 654-55, 466 P.3d 902 (2020). Where there is no ambiguity, the court need not resort to statutory construction. Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history to construe the Legislature's intent. *In re M.M.*, 312 Kan. 872, 874, 482 P.3d 583 (2021).

A.      *Statutory Text*

We begin with the text of the statutes, set out above. We have no quarrel with the Board's reliance on the plain language of the two statutes, or its finding that the two statutes use different language.

K.S.A. 44-510e(a)(2)(B) requires functional impairment to be "established by competent medical evidence" and "based on the sixth edition" of the Guides," while K.S.A. 44-510d(b)(23) states that impairment of function "shall be determined by using the sixth edition" of the Guides and includes no reference to competent medical evidence. And although non-scheduled injuries are in part "based on" the Guides (K.S.A. 44-510e[a][2][B]), scheduled injuries "shall be determined" by using the Guides, K.S.A. 44-510d(b)(23). We agree with the Board that the language is distinctively different. Although the phrase "based on" typically signifies a starting place or a guideline, *Johnson,* 312 Kan. at 602, "determined by" seems more restrictive. And in interpreting parallel statutes, we have noted that the language in one statute may illustrate that the Legislature knows how to state something omitted in another statute. See *State v. Nambo,* 295 Kan. 1, 4-5, 281 P.3d 525 (2012). That is where our analysis begins.

But unlike the Board, we do not stop there. As always, we must read the statute in its proper context. To do that, we rely on the doctrine of *in pari materia*. Appellate courts must consider various provisions of an act *in pari materia* with a view of reconciling and bringing the provisions into workable harmony if possible. *Miller v. Board of Wabaunsee County Comm'rs*, 305 Kan. 1056, 1066, 390 P.3d 504 (2017). We must construe statutes to avoid unreasonable or absurd results, and we presume the Legislature does not intend to enact meaningless legislation. *In re Marriage of Traster*, 301 Kan. 88, 98, 339 P.3d 778 (2014).

Recently, the Kansas Supreme Court explained that to determine the plain meaning of an unambiguous statute, we look not only to the statute's language, but also to the specific context in which that language is used, as well as to the broader context of the statute as a whole:

> "But even when the language of the statute is clear, we must still consider various provisions of an act *in pari materia* to reconcile and bring those provisions into workable harmony, if possible. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 919, 349 P.3d 469 (2015); *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 918, 296 P.3d 1106 (2013). Thus, the doctrine of *in pari materia* has utility beyond those instances where statutory ambiguity exists. It can be used as a tool to assess whether the statutory language is plain and unambiguous in the first instance, and it can provide substance and meaning to a court's plain language interpretation of a statute." *Bruce v. Kelly*, 316 Kan. 218, 224, 514 P.3d 1007 (2022).

We thus read the Act's statutory definitions together with the statute in question to determine its plain meaning.

The Workers Compensation Act, K.S.A. 44-501 et seq., defines "functional impairment" as

"the extent, expressed as a percentage, of the loss of a portion of the total physiological capabilities of the human body as established by competent medical evidence and based on the fourth edition of the American medical association guides to the evaluation of impairment, if the impairment is contained therein." K.S.A. 44-508(u).

Although this statute refers to the Fourth Edition rather than the Sixth, the parties agree that the Sixth applies to Weaver's injury. There is thus no dispute before us as to which edition applies.

"Functional impairment," as defined in K.S.A. 44-508(u), is the logical equivalent of "impairment of function," as used in K.S.A. 44-510d(b)(23). Using K.S.A. 44-508(u)'s definition, our evaluation of functional impairment must be established by competent medical evidence and be based on the relevant edition of the Guides. That definition applies regardless of whether a worker has suffered a scheduled or non-scheduled injury.

The broader context of the Act also supports that conclusion. The ALJ, by referring Weaver for an IME, tacitly found that two medical opinions *based on competent medical evidence* disagreed as to the percentage of his functional impairment. See K.S.A. 44-516(b) ("If at least two medical opinions based on competent medical evidence disagree as to the percentage of functional impairment, such matter may be referred by the administrative law judge to an independent health care provider who shall be agreed upon by the parties.").

The plain language of K.S.A. 44-510d(b)(23), read in context, thus counsels that ratings for scheduled injuries may consider competent medical evidence and need not be based solely on the relevant edition of the Guides. The Guides serve as a starting point, yet not necessarily an ending point.

B.      *Relevant Caselaw*

No Kansas appellate case has examined this issue relating to scheduled injuries. Yet we find guidance from two recent cases on the same issue in the context of non-scheduled injuries. Recently, the Kansas Supreme Court considered the constitutionality of K.S.A. 44-510e(a)(2)(B), which governs non-scheduled injuries. See *Johnson*, 312 Kan. 597. That appeal arose because the phrase "competent medical evidence" does not appear in the portion of the statute referring to post-January 1, 2015 injuries, but does appear in the portion of the statute referring to pre-2015 injuries.

K.S.A. 44-510e(a)(2)(B), regarding non-scheduled injuries, states:

"The extent of permanent partial general disability shall be the percentage of functional impairment the employee sustained on account of the injury as established by competent medical evidence and based on the fourth edition of the American medical association guides to the evaluation of permanent impairment, if the impairment is contained therein, until January 1, 2015, but for injuries occurring on and after January 1, 2015, based on the sixth edition of the American medical association guides to the evaluation of permanent impairment, if the impairment is contained therein."

Johnson alleged that this statute was unconstitutional because a worker's right to an adequate remedy under section 18 of the Kansas Constitution Bill of Rights would be denied if only the Sixth Edition were considered. The Court of Appeals agreed, holding K.S.A. 2015 Supp. 44-510e(a)(2)(B) unconstitutional on its face. *Johnson v. U.S. Food Service*, 56 Kan. App. 2d 232, 257, 427 P.3d 996 (2018), *rev'd* 312 Kan. 597, 478 P.3d 776 (2021). But the Kansas Supreme Court rejected that argument, found the statute ambiguous, and applied the doctrine of constitutional avoidance.

15

The *Johnson* court observed that the 2013 changes to the Act did not alter the legal requirement that functional impairment must always consider competent medical evidence:

> "The 2013 amendments merely reflect an update to the most recent set of guidelines—which serve as a starting point for any medical opinion. K.S.A. 2019 Supp. 44-510e(a)(2)(B) has never dictated that the functional impairment is set by guides. This has not changed. The key fact—percentage of functional impairment—must always be proved by competent medical evidence." 312 Kan. at 603.

We are not dealing with that non-scheduled injury statute here because Weaver's is a scheduled injury controlled by K.S.A. 44-510d(b)(23). Yet the same logic applies. The definition for "functional impairment" in the Act has always required that it be "established by competent medical evidence." See K.S.A. 44-508(u). So for scheduled injuries as well as for non-scheduled injuries, the key fact—the percentage of functional impairment—must always be proved by competent medical evidence.

Similarly, in *Garcia v. Tyson Fresh Meats, Inc.*, 61 Kan. App. 2d 520, 506 P.3d 283 (2022), another panel of this court discussed the purpose of the Act's quid pro quo by which workers forfeit their right to bring a tort case in return for an adequate set of substitute benefits. To achieve that purpose, the impairment rating process must consider all relevant information:

> "A process which ensures that all relevant information is represented in the impairment rating equation safeguards the injured worker's right to receive a 'viable and sufficient substitute remedy' for the relinquishment of their ability to pursue a tort-based claim. See *Lemuz v. Fieser*, 261 Kan. 936, 959, 933 P.2d 134 (1997)." *Garcia*, 61 Kan. App. 2d at 530.

Weaver makes a facially valid argument that prohibiting consideration of relevant competent medical evidence about his injury would violate his procedural due

16

process rights. See K.S.A. 44-501b(c) ("The burden of proof shall be on the claimant to establish the claimant's right to an award of compensation and to prove the various conditions on which the claimant's right depends. In determining whether the claimant has satisfied this burden of proof, the trier of fact shall consider the whole record."). And under the rule of constitutional avoidance, it is our "duty to construe a statute as constitutionally valid when [we are] faced with more than one reasonable interpretation." *Hoesli v. Triplett, Inc.*, 303 Kan. 358, 367, 361 P.3d 504 (2015).

In *Garcia*, the Board had adopted an impairment rating for a non-scheduled injury based solely on the Sixth Edition without considering competent medical evidence. A panel from this court remanded the case for reevaluation with the directive that ratings be grounded in a comprehensive assessment of competent medical evidence, with the Sixth Edition as a starting point. 61 Kan. App. 2d at 531-32. The panel ultimately concluded that its analysis may require recalculation of Garcia's impairment rating and, in doing so,

> "the evaluating physicians' starting point for Garcia's rating must be the Sixth Edition. If, in a physicians' expert medical opinion, the Guides provide too narrow a view of Garcia's ability to work and a similarly understated functional impairment, they may (and should) augment their evaluations using those tests, exams, reports, or resources they determine in their professional expertise will yield a more accurate result." 61 Kan. App. 2d at 533.

We recognize that *Johnson* and *Garcia* dealt with non-scheduled injuries, yet we find the broad language and the logic of those cases apply to scheduled injuries as well. We see no good reason one should use competent medical evidence for non-scheduled injuries, but not for scheduled injuries. True, because we are dealing with a scheduled injury, the statutory percentage rating of impairment has primary importance, since the Legislature has translated the percentage into a fixed rate of permanent disability. See *Redd v. Kansas Truck Center*, 291 Kan. 176, 196-97, 239 P.3d 66 (2010) (finding the AMA Guides are a "general instruction manual" for physicians to provide some

17

objectivity for evaluating workers compensation injuries, but the Legislature did not intend them to supplant the Act's use of scheduled benefits).

Still, Wyandotte County does not show us why reliance on the Guides should be conclusive for scheduled injuries but not for non-scheduled injuries. Because both statutes seek to determine the percentage of functional impairment sustained on account of the work-related injury—a determination heavily dependent on medical evidence—competent medical evidence may be considered for both scheduled and non-scheduled injuries.

C.      *Competent Medical Evidence*

Our conclusion that "competent medical evidence" may be considered under K.S.A. 44-510d(b)(23) leads us to the parties' first true dispute on appeal: Was Weaver's award based on such evidence? Wyandotte County contends that Dr. Carabetta's testimony, which the Board found to be most credible, was based on a reasonable degree of medical certainty so the Board's finding was necessarily based on competent medical evidence. On the other hand, Weaver argues that Dr. Carabetta's rating was based solely on the Sixth Edition rating of 8% and excluded other competent medical evidence.

The Act mentions yet does not define "competent medical evidence." But several cases have discussed what constitutes such evidence. In *Clayton v. University of Kansas Hosp. Auth.*, 53 Kan. App. 2d 376, 382, 388 P.3d 187 (2017), the parties agreed "the term 'competent medical evidence' in the context of workers compensation would normally mean an opinion asserted by a health care provider that is expressed in terms of 'reasonable degree of medical probability' or similar language." The Kansas Supreme Court has similarly classified competent medical evidence, holding that the opinion of a health care provider stated with a reasonable degree of medical certainty is sufficient competent medical evidence of causation. See *Webber v. Automotive Controls Corp.*, 272

18

Kan. 700, 704-05, 35 P.3d 788 (2001); see also *Mulder v. Menard, Inc.*, No. AP-00-0458-678, 2021 WL 6275018, at *5 (Kan. Work. Comp. App. Bd. December 29, 2021) (holding "'competent medical evidence' is the opinion of a physician given within a 'reasonable degree of medical probability'"). It is undisputed that Dr. Carabetta's testimony was based on a reasonable degree of medical certainty.

But the amorphous definition above largely relates to the admissibility of expert medical opinions and does not provide much, if any, practical guidance as to what competent medical evidence is. See *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 307-08, 756 P.2d 416 (1988) (expert medical opinion requires at least professional probability). Opinions, including medical expert opinions, must be based on facts. K.S.A. 2022 Supp. 60-456(b) (sufficient facts and reliable principles or methods). For more practical guidance, we look to *Garcia*, 61 Kan. App. 2d at 531-32, which directed a physician to use the Sixth Edition and, if applicable, to "incorporate[] whatever exams, patient reports, tests, or research that their training and experience directs them to use so they might arrive at a fair and comprehensive result."

We agree with the *Garcia* panel that an examining physician may find that the relevant edition of the Guides alone provides, or fails to provide, a sufficient basis for the physician's assessment:

> "In some circumstances, an examining physician might conclude the Sixth Edition provides a sufficient basis alone to make a medically competent assessment of a worker's impairment rating. By the same token, however, in other circumstances, the Sixth Edition may be insufficient, requiring the examining physician to consider other reliable sources to make a professionally informed rating. And, as with other things in the workers compensation field, medical experts may disagree on the universe of information underpinning 'competent medical evidence' in a particular case." 61 Kan. App. 2d at 532.

19

See generally *W.A. Krueger Co. v. Industrial Comm'n of Arizona*, 150 Ariz. 66, 67, 722 P.2d 234 (1986) (The Guides are not to be blindly applied regardless of a claimant's actual physical condition. Rather, their purpose is to serve as a *guideline* in rating an impairment and are valid when the stated percentage truly reflects the claimant's loss.); *Gomez v. Industrial Comm'n of Arizona*, 148 Ariz. 565, 570, 716 P.2d 22 (1986) (the Guides alone were sufficient when the physicians agreed they accurately measured the employee's scheduled loss).

The parties disagree as to what Dr. Carabetta's testimony meant, so we set it out at length:

"[WEAVER'S COUNSEL]: . . . So according to Johnson, you don't give a 4th rating. You start with the 6th and then you come up with what you believe to be the most accurate rating for the individual's impairment that he sustained—or he or she sustained in the work accident. Fair statement?

"[DR. CARABETTA]: Fair statement. And the way I do it is I have to back it up by something.

"[WEAVER'S COUNSEL]: Mm-hmm.

"[DR. CARABETTA]: I can't say, 'Hey, in the Bible somewhere it says,' and then just make up something, because I guess you can piece words together, but it may not be exactly accurate. So I view it as one where if I just think it should be higher, that's not enough for me. I want some proof for myself. So I want to go and look at a past edition or another book that gives additional information, such as the VA puts out, and get some additional information and then apply it.

"[WEAVER'S COUNSEL]: Well, if in this particular case you used the AMA Guides 6th Edition as a standard starting point, but you then take into consideration the more important and decisive competent medical evidence as established in the Johnson case—and that would include your own expertise, your own training, knowledge, expertise, also considering the thoroughness of your clinical examination, your review of medical records including any diagnostic studies, as well as Mr. Weaver's subjective complaints, as well as reviewing any other manuals, treatise, medical journal articles, or anything else available to you that would be in your toolbox as a practicing physiatrist at

the level that you do it—what do you believe would be the appropriate level of permanent impairment that Mr. Weaver sustained as a result of the August 20, 2018, work accident in isolation?

       "[Objection from Weaver's counsel]

       "[DR. CARABETTA]:  Okay. From my clinical perspective, I don't see a significant difference between the 10 percent and the 8 percent. They're actually pretty darn close—you could average them out to 9—and if you told me is 9 more correct, and the answer is they're roughly about the same.

       . . . .

"They're pretty similar. I hope you can work that out, but the question I ask myself is is there a major difference between them, and from my perspective, there is not. They're both fairly close. 10 percent is just as accurate as the 8 percent."

While Dr. Carabetta discussed the accuracy of his Fourth Edition rating and the Sixth Edition rating (a discussion we omit above), it is unclear whether he considered anything other than the Guides when making his impairment rating. True, Dr. Carabetta testified that it is his practice, when determining an impairment rating, to look beyond the Guides, to back up the rating with additional information, and to apply that information. But when asked whether he followed that practice when rating Weaver, Dr. Carabetta dodged answering that question. He instead compared the Sixth and Fourth Editions of the Guides, assessed their two ratings as "pretty darn close," and concluded that he did not "see a significant difference between" them.

We cannot find based on this record that Dr. Carabetta started with the Sixth Edition and then considered other competent medical evidence in determining an 8% impairment. Nor can we find that Dr. Carabetta determined that the Sixth Edition alone provided a sufficient basis for his medically competent assessment, so he decided he had no need to consider other reliable sources in making a professionally informed rating. We simply cannot tell from his testimony what he did or did not consider. The Board and the ALJ interpreted Dr. Carabetta's testimony to mean that he did not look beyond the Sixth Edition to consider other competent medical evidence and both relied on Dr. Carabetta's

21

impairment rating based on the Sixth Edition. The Board's award was thus erroneously based on a functional impairment rating that considered solely the Sixth Edition of the Guides.

Accordingly, we remand this case for reevaluation consistent with our holding that to determine a functional impairment rating for scheduled injuries, the fact-finder begin with the Sixth Edition as a starting point and consider competent medical evidence to modify or confirm that rating.

## II. DID THE BOARD CORRECTLY FIND K.S.A. 44-501(e) INAPPLICABLE WHEN CALCULATING WEAVER'S AWARD?

On cross-appeal, Wyandotte County argues that the Board violated K.S.A. 44-501(e) by failing to reduce Weaver's award by the dollar amount of Weaver's conclusively established preexisting impairment. It argues that Weaver had prior work injuries to the right upper extremity which were settled for a total of 30% permanent partial impairment, so Weaver should not receive any permanent partial impairment benefits for his current work injury to that same extremity. Weaver counters that the statute requires reduction of benefits only for preexisting injuries to the exact same body part, not for all body parts in the same general region, thus no reduction of benefits is warranted.

Although we are remanding this case based on the first issue, we address this second issue because it is likely to arise on remand. This issue presents an issue of statutory interpretation, so our review is de novo. *Johnson*, 312 Kan. at 600.

It is undisputed that Weaver had these prior work injuries and impairments:

| Injury date | Injured body part | Impairment rating |
| --- | --- | --- |
| March 2009 | Right middle finger | 10% impairment |
| May 2011 | Right wrist below first and second fingers | 12% impairment |
| March 2016 | Right elbow | 10% impairment |
| May 2016 | First and second fingers of right hand | 10% impairment |

Weaver's current injury in August 2018 was to both sides of Weaver's right hand below his pinky and ring fingers, and to his right wrist and thumb.

The pertinent statute reads:

"(e) An award of compensation for permanent partial impairment, work disability, or permanent total disability shall be reduced by the amount of functional impairment determined to be preexisting. . . .

"(1) Where workers compensation benefits have previously been awarded through settlement or judicial or administrative determination in Kansas, the percentage basis of the prior settlement or award shall conclusively establish the amount of functional impairment determined to be preexisting." K.S.A. 44-501(e).

Both the ALJ and the Board found this statute inapplicable because no physician found any of Weaver's current functional impairment to be preexisting. The ALJ stated that the

"respective impairment ratings did not include any preexisting impairments to [Weaver's] right upper extremity, but rather were reflective of only the permanent partial impairment [Weaver] sustained as a result of the August 20, 2018, work injury alone. Given that none of the expert physicians have included preexisting impairment in their ratings, it cannot

23

be said that any of the current functional impairment can be deemed to be preexisting, as is required under K.S.A. 44-501(e)(2)(A) for Respondent to obtain a credit."

Similarly, the Board held that each physician's impairment rating was "over and above" Weaver's prior impairments:

"Under K.S.A. 44-501(e), an award of compensation shall be reduced by the amount of functional impairment determined to be preexisting. Under K.S.A. 44-501(e)(2)(A), in order to apply the credit for preexisting impairment, the Board must consider the percentage of functional impairment determined to be preexisting. Each physician testified their assessment of impairment was over and above Claimant's prior impairments. As such, no amount of the impairment awarded by the ALJ was preexisting.
"Respondent is not entitled to a credit for preexisting impairment."

Dr. Carabetta determined that Weaver had a 30% combined overall impairment of his right upper extremity before the August 2018 work related injury using Weaver's prior settlements and the Guides as a basis. Because Weaver had previously been awarded workers compensation benefits through settlement in Kansas, the percentage basis of his prior settlements "conclusively establish[es] the amount of functional impairment determined to be preexisting." K.S.A. 44-501(e)(1). The parties do not dispute that 30% reflects the correct amount of Weaver's prior combined impairment of his right upper extremity before his current work injury.

But Dr. Carabetta testified that Weaver's 8% impairment rating resulted from a new functional impairment due to his August 2018 work accident. In other words, Weaver's 8% impairment was over and above any impairments he had sustained in the past. Dr. Carabetta testified that he took great care not to include impairment ratings that would be associated with Weaver's prior injuries. His rating of 8% permanent impairment was for Weaver's new and distinct injury and impairment from the August 2018 accident,

24

not from any preexisting impairment. The other physicians similarly stated their impairment ratings as in addition to those Weaver had previously sustained.

Both parties agree that K.S.A. 44-501(e) requires a reduction of benefits, when applicable, but they disagree as to what part of the body must be previously impaired. Wyandotte County argues that because Dr. Carabetta found that Weaver had a 30% combined overall impairment of his right upper extremity before the August 2018 work related injury, Weaver's 8% award for impairment to his right upper extremity should be reduced by 30%, as the plain language of the statute requires. To the contrary, Weaver argues that K.S.A. 44-501(e) requires a reduction only for the preexisting functional impairment caused by a prior injury of the exact same body part; and because the physicians agreed that their impairment ratings were above and beyond any preexisting impairment, no reduction should be made.

A.      *Weaver's interpretation is too narrow.*

As discussed above, our goal is to determine the legislative intent of the statute. To do so through the statutory language enacted, we give common words their ordinary meanings. *Montgomery*, 311 Kan. at 654. Again, we determine legislative intent by looking at the statutory language enacted, including the definitions provided within the Act. See *Bruce*, 316 Kan. at 224. So we return to the definition of "functional impairment":

> "the extent, expressed as a percentage, of the loss of a portion of the total physiological capabilities of the human body as established by competent medical evidence and based on the fourth edition of the American medical association guides to the evaluation of impairment, if the impairment is contained therein." K.S.A. 44-508(u).

25

A functional impairment thus consists of "the loss of a portion of the total physiological capabilities of the human body." The statute does not define functional impairment as the loss of a portion of the human body but speaks more generally to some loss of the body's "total physiological capabilities." This language recognizes that an injury to one part of the body may functionally impair a different part of the body. Similarly, it permits the conclusion that successive injuries to the same body part may cause different impairments of that same body part.

Weaver's interpretation, which would limit a preexisting impairment to one based on an injury to the same exact body part, is too narrow. This is because an injury to one's right hand and a later injury to one's right finger may cause separate or overlapping functional impairments, despite the separate anatomical situs of the injuries. Yet Weaver would have us find that an injury to one part of the body can never share a functional impairment with a different part of the body, injured separately. Without any medical support for that general proposition, we decline to adopt it.

Workers compensation benefit determinations in Kansas are based on the location of the impairment manifestation, not on the situs of the injury. "It is the situs of the resulting disability, not the situs of the trauma, which determines the workers' compensation benefits available in this state." *Fogle v. Sedgwick County*, 235 Kan. 386, 386, 680 P.2d 287 (1984). Thus, even though Fogle had injured a nerve root in his back, he sustained no back disability; instead, the disability manifested itself in his arm, warranting compensation under K.S.A. 44-510d for a scheduled disability. That same principle controlled in *Bryant v. Excel Corp.*, 239 Kan. 688, 692, 722 P.2d 579 (1986). There, an injury to a nerve in the arm manifested itself by disability in both the arm and shoulder, so Bryant was entitled to recover for an unscheduled injury under K.S.A. 44-510e. See also *Scheuerman v. Learjet, Inc.*, No. 109,400, 2014 WL 1795999, at *4 (Kan. App. 2014) (unpublished opinion) (affirming award of whole-body injury for neck pain caused by a shoulder injury and not a distinct injury to the neck). Although these cases

26

examined predecessor statutes, they illustrate the practical problems with Weaver's definition that limits preexisting impairment to impairment from two successive workplace injuries to the exact same body part.

B.    *Wyandotte County's interpretation is too broad.*

But neither do we adopt Wyandotte County's interpretation, as it would lead to unreasonable results. "Generally, courts should construe statutes to avoid unreasonable results and should presume that the legislature does not intend to enact useless or meaningless legislation." *Milano's, Inc. v. Kansas Dept. of Labor*, 296 Kan. 497, 501, 293 P.3d 707 (2013); see *State v. Eckert*, 317 Kan. 21, 31, 522 P.3d 796 (2023) ("A court 'must construe a statute to avoid unreasonable or absurd results.' [Citation omitted.]").

Under Wyandotte County's proposed reading, Weaver's prior elbow injury would reduce his current injury to his wrist, ring and pinky fingers, and thumb because all "right upper extremity" awards are per se preexisting impairments to any current injury to that same general area. That overly broad reading would require a reduction of benefits for a new impairment even though it is unrelated to a preexisting impairment, just because the impairments are in the same bodily extremity.

Although that interpretation may uphold any intent of the legislation to prevent claimants from double recovery for an injury, it would bar claimants from receiving benefits for unrelated injuries that happen in the same region of the body. And barring a worker from receiving an award for a new and distinct work-related impairment smacks of unfairness, seems to violate the legislative intent to permit recovery for injury from workplace accidents, and may violate the worker's due process rights. See *Pardo v. United Parcel Service*, 56 Kan. App. 2d 1, 20, 422 P.3d 1185 (2018) (finding K.S.A. 44-510d[b][23] unconstitutional as applied when Pardo's award was zero for a second rotator cuff injury because he got "*nothing* in exchange for the removal of his right under § 18 to

27

seek a common-law award from his employer, which flies directly in the face of the quid pro quo foundation that makes the Act constitutional").

K.S.A. 44-510d(b)(23) states that "[l]oss of or loss of use of a scheduled member shall be based upon permanent impairment of function to the scheduled member." The Legislature could have chosen to reduce the permanent partial impairment award for scheduled injuries by the amount of preexisting impairment to the same scheduled member, or to the exact same body part, or to the same bodily extremity, or to the same region of the same extremity, or otherwise, yet it did not do so. Instead, it merely said that such an award "shall be reduced by the amount of functional impairment determined to be preexisting." K.S.A. 44-501(e). In the absence of any specific anatomical limitations in this statute, we decline to write any in. *Montgomery,* 311 Kan. at 654-55 (court should avoid reading something into the statute that is not readily found in its words). We find it reasonable that the Legislature intended the use of medical expertise to address the nuances involved in determining impairments of the human anatomy.

C.      *Preexisting functional impairment is a medical determination.*

The determination whether a claimant's functional impairment, or any part of it, is preexisting, is a medical determination. As Dr. Carabetta explained, a person's previous injury to the same body part may or may not cause a preexisting impairment:

> "Because you can break your wrist and be compensated for it, but you could break the wrist again and suffer more deformity such that it doesn't move the same way and we can say you had a wrist fracture before we compensated you, but it's actually further damaged.
>
>      . . . .
>
>      "But if they have an injury to the same hand but different parts of the hand, as we have in the case of Mr. Weaver, each one has to be dealt with individually. But if the same exact area has been traumatized and there is no difference in its mobility, its strength, et

28

cetera, then that one is a wash. That one doesn't count. So I medically have to look at it specifically in isolation."

The determination that a claimant has a preexisting impairment cannot simply be made by finding that a claimant's prior awards all establish preexisting functional impairment, regardless of the situs of the impairment resulting from the current injury. It is merely the *amount* of functional impairment that is conclusively established by prior awards, once the medical expert determines that the impairment caused by the current injury existed before the current injury occurred so it is, in fact, preexisting. The employer thus no longer bears the burden to establish the amount of preexisting impairment to be deducted. Compare K.S.A. 44-501(e)(1) (When workers compensation benefits have previously been awarded "the percentage basis of the prior settlement or award shall conclusively establish the amount of functional impairment determined to be preexisting.") with *Ward v. Allen County Hospital*, 50 Kan. App. 2d 280, 324 P.3d 1122 (2014) (finding that under K.S.A. 44-510e[a], once it is established that workers compensation claimant's current injury is an aggravation of the preexisting injury, employer has the burden of proving the amount of preexisting impairment to be deducted, and this determination must be based upon the AMA Guides). Because Dr. Carabetta determined that no functional impairment from Weaver's August 2018 injury was preexisting, the amount of Weaver's prior awards is immaterial.

D.     *Relevant Caselaw*

The Board has dealt with this issue before and has seemingly based its determination of preexisting impairments on the location of the impairment's manifestation, not on the situs of the injury. In *Jackson v. Amsted Rail Co.*, No. 1,058,952, 2013 WL 5521839, at *6-7 (Kan. Work. Comp. App. Bd. September 12, 2013), the Board applied K.S.A. 44-501(e) to reduce the claimant's second injury award by the present value of the first injury's impairment. Jackson had injured his right

29

shoulder twice during his course of employment. In 2003, he was awarded permanent partial disability benefits based on an 18% impairment to the shoulder. He then reinjured that same shoulder in 2011. Both injuries were labral tears of the right shoulder, although the second also tore his rotator cuff. The Board upheld an award of permanent partial disability benefits based on a 20% functional impairment to his right upper extremity at the level of the shoulder, then reduced it at the current dollar value of his preexisting 18% impairment rating. This case illustrates proper application of K.S.A. 44-501(e)—reducing benefits when preexisting impairments are shown. Still, Wyandotte County fails to show that Weaver's impairments caused by his current injury existed before his current injury.

In *Keenan v. State*, No. AP-00-0462-203, 2022 WL 1057711, at *6 (Kan. Work. Comp. App. Bd. March 22, 2022), the Board found a 23% impairment to the body as a whole for a 2019 accident for various injuries (not including carpal tunnel injury) to the claimant's upper right extremity. Keenan had received a prior workers compensation award for bilateral carpal tunnel injuries. Yet the Board made no reduction under K.S.A. 44-501(e) for preexisting impairments, reasoning:

> "Claimant's award of compensation in her first claim was limited to bilateral carpal tunnel injuries. The new claim is for new and distinct body parts for which compensation has not been awarded. Therefore, there is no 'functional impairment determined to be preexisting' as contemplated by the credit contained under K.S.A. 44-501(e) for the newly injured body parts and the credit does not apply." 2022 WL 1057711, at *6.

This case cuts against Wyandotte County's assertion that all prior awards for right upper extremity impairment are per se preexisting impairments under K.S.A. 44-501(e) to a later impairment of the right upper extremity.

Weaver's case is more like *Keenan* than *Jackson*. Weaver's prior injuries were to his right middle finger, right wrist below the first and second fingers, right elbow, and

30

right first and second fingers. Weaver's current injury was to his right hand and wrist below his ring and pinky fingers, his right thumb, and his wrist below his thumb. No physician testified that these injuries caused any overlapping impairment, or that Weaver's right hand and wrist below his ring and pinky fingers, his right thumb, or his wrist below his thumb were previously impaired. The record lacks any evidence that Weaver's prior impairments had any relation to the impairments caused by his current accident. Thus, Wyandotte County has not shown that any impairments from Weaver's August 2018 injury were preexisting as that term is used in K.S.A. 44-501(e).

Wyandotte County relies on two other cases to argue the Board erred by not reducing Weaver's benefits under K.S.A. 44-501(e): *Payne v. Boeing Co.*, 39 Kan. App. 2d 353, 180 P.3d 590 (2008), *abrogated by Ballard v. Dondlinger & Sons Const. Co.*, 51 Kan. App. 2d 855, 355 P.3d 707 (2015), and *Ward v. Allen County Hospital*, 50 Kan. App. 2d 280, 324 P.3d 1122 (2014). Both cases applied K.S.A. 44-501(e) to reduce the claimant's award by their preexisting impairment. But in those cases, as in *Jackson* and *Willoughby*, the preexisting and later injuries were to the same body part, see *Ward*, 50 Kan. App. 2d at 282 (injuries to the same vertebra); *Payne,* 39 Kan. App. 2d at 355-56 (injuries to lower back), and no one contended that the impairments were unrelated or different. Not so here. No reduction under K.S.A. 44-501(e) in Weaver's award is supported by the evidence.

We find it unnecessary to adopt either party's desired wording. We find no reversible error in the Board's analysis. The Board considered K.S.A. 44-501(e) and made a reasoned decision that no reduction under the statute could be made because it had no evidence of preexisting impairment. The physicians agreed that Weaver's current impairment was different from the impairments for which he had previously been compensated. The record includes no medical testimony to the contrary. Cf. *Hanson v. Logan U.S.D. 326*, 28 Kan. App. 2d 92, 96, 11 P.3d 1184 (2000) (applying previous "aggravation" statute, finding that because the record lacked any evidence of the amount

31

of preexisting disability or impairment, the Board had no choice but to deduct zero from the total).

Affirmed in part, reversed in part, and remanded with directions.